[Cite as *State v. Stewart*, 2009-Ohio-3411.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SENECA COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                  CASE NO.  13-08-18

    v.

DARRION A. STEWART,                   O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Seneca County Common Pleas Court
Trial Court No. 07-CR-0154

**Judgment Affirmed**

**Date of Decision:    July 13, 2009**

APPEARANCES:

    *Jeffrey M. Brandt*  for Appellant

    *Gregory A. Tapocsi*  for Appellee

Case No. 13-08-18

**SHAW, J.**

{¶1} Defendant-Appellant Darrion A. Stewart ("Stewart") appeals from the May 14, 2008 Judgment Entry of the Court of Common Pleas, Seneca County, Ohio sentencing him to a total prison term of thirty-six years and eleven months for his conviction on twenty-three charges.

{¶2} The charges against Stewart stemmed from drug activity occurring from 2005 through Stewart's arrest on July 27, 2007. As part of the investigation, a series of controlled drug purchases were made under the direction of Detective Charles Boyer ("Detective Boyer") with the Seneca County Drug Task Force. Detective Boyer testified that the investigation in the present case originated from complaints involving drug activity around a six block radius in Fostoria.

{¶3} The charged conduct began on October 19, 2005, when confidential informant (CI)[1] Cheyenne Bloom ("Bloom") was directed to make a controlled drug purchase in Fostoria. Bloom drove through Fostoria and made contact with a man in an alley behind Jack's Carry-out. Bloom, who identified Stewart as the person he met in the alley, stated that he asked Stewart for "a 50," and was given a

---

[1] At trial, testimony was given that many of the controlled drug purchases in the present case were made through the assistance of confidential informants. In offering testimony involving the use of confidential informants, a standard procedure that is carried out prior to the drug purchase was outlined by Detective Boyer. First, the CI's body is searched for contraband. If a CI's vehicle is being used, it is also searched for contraband. Next, the CI is equipped with audio and video recording devices to record the drug purchase. Also, the CI is issued money with which to make the drug purchase. Money issued to a CI has been photocopied or marked so that the money can be later identified.

After a drug purchase, a CI is again searched and the recording equipment is removed. Also, the audio and video recordings are transferred to a computer and made into CDs of the transaction. Moreover, CI's are asked to initial any evidence relating to the transaction.

little plastic baggie of crack cocaine. (Tr.p. 1171). Upon completing the purchase, Bloom turned over the purchase to Detective Boyer, who he met at a secure location after completing the buy.

{¶4} Anthony Tambasco ("Tambasco") a forensic scientist with the Mansfield Police Department Crime Laboratory testified that the baggie of crack cocaine Bloom received from Stewart contained .58 grams of crack cocaine. Both audio and video recordings of this transaction were introduced at trial and played for the jury. (Tr.p. 1178).

{¶5} On February 14, 2006 another controlled drug purchase was made using CI Charles Roberts ("Roberts"). After a prior controlled drug purchase, Roberts asked the person who sold him drugs where he could purchase a larger amount of drugs. Roberts was given a cell phone number. After obtaining the cell phone number, Roberts contacted Detective Boyer to determine if he wanted to pursue this lead. (Tr.p. 1186).

{¶6} Detective Boyer had Roberts call the cell phone number on February 14, 2006. When Roberts called, he reached a man, who he later identified as Stewart, who told him that he was "out of town," and then hung up the phone. (Tr.p. 1188-1189). Roberts then called again and Stewart did not answer the phone. A third phone call was made, this time Stewart answered and told Roberts to "call my girl." Stewart then gave Roberts another phone number. (Tr.p. 1191).

{¶7} Roberts called the phone number supplied by Stewart and made contact with a female that he subsequently identified as Alexa Johnson ("Johnson"). Roberts and Johnson arranged to meet outside her residence located at 112 ½ East North Street in Fostoria for Roberts to purchase a quarter of an ounce of crack cocaine for $250. The purchase was made as scheduled with Johnson meeting Roberts outside 112 ½ East North Street. Scott Dobransky ("Dobransky"), a forensic scientist with the Ohio Bureau of Criminal Identification and Investigation testified that the weight of the purchase was 6.68 grams of crack cocaine, or approximately a quarter ounce. The purchase was recorded on both audio and video tapes and played for the jury at trial.

{¶8} During the purchase, Roberts told Johnson that he was trying to "flip" the crack cocaine. (Tr.p. 1200). At trial, Roberts testified that by "flip" he meant breaking the 6.68 grams into smaller pieces and selling it, so that he could buy a greater quantity the next time. Immediately after making the quarter ounce purchase on February 14, 2006 Roberts called Stewart and stated that he would be buying more crack cocaine in several days, after he flipped the February 14, 2006 purchase. Roberts told Stewart that he wanted to purchase a larger quantity next time. This call was also recorded and played for the jury.

{¶9} The next purchase was made on February 16, 2006. Roberts again contacted Stewart and was told by Stewart that he was out of town and that

Roberts should contact Johnson. Roberts then called Johnson, who arranged to sell him a half ounce of cocaine for $450. Johnson arranged to meet Roberts outside of 112 ½ East North Street to complete the purchase.

{¶10} Roberts met Johnson behind 112 ½ East North Street and accepted the crack cocaine. However, upon weighing the crack cocaine, Roberts discovered that it weighed less than the half ounce that he had paid Johnson for and had planned to purchase. Roberts argued with Johnson, who then went back into 112 ½ East North Street and retrieved some powder cocaine to make up the rest of the amount. Tambasco testified that during this transaction, 13.29 grams of crack cocaine and .96 grams of powder cocaine were actually purchased by Roberts. Audio and video tapes of this transaction were also played for the jury.

{¶11} A similar purchase occurred February 19, 2006 wherein Roberts first called Stewart and was directed to contact Johnson. When Roberts made contact with Johnson, he told her he wanted to purchase an ounce from Johnson. The price for this purchase was $900. When Roberts arrived at 112 ½ East North Street, he met Johnson, who informed him that she did not have crack cocaine, only powder cocaine. Johnson then asked Roberts to drive her to a Kroger to purchase some baking soda to cook the powder cocaine into crack cocaine and then requested that Roberts waited for the cooking process to be completed before

returning to make the purchase.[2] Johnson testified at trial that she did not cook the crack cocaine, but that Stewart always did the cooking and was in the apartment cooking the crack cocaine on this occasion.

{¶12} After waiting approximately twenty minutes for the crack to be cooked, Roberts returned to 112 ½ East North Street to purchase the ounce of crack cocaine. Johnson again brought the crack cocaine downstairs from 112 ½ East North Street. However, this sale was also short of the full ounce of crack cocaine, so Johnson against supplemented the amount with a small amount of powder cocaine. Tambasco testified that, based on his analysis, Roberts received 24.99 grams of crack cocaine and 1.46 grams of powder cocaine during this transaction. Audio and video tapes of this transaction were also played for the jury.

{¶13} Another purchase occurred on February 27, 2006. Roberts first called Stewart and was directed to contact Johnson, whom he met behind 112 ½ East North Street to complete the transaction. Roberts had arranged to purchase two ounces of crack cocaine for $1,800, but again found the amounts lacking when he weighed the crack cocaine using his own scale. Johnson again went back into 112 ½ East North Street to retrieve additional powder cocaine to make up the

---

[2] Crack cocaine is "cooked" by boiling water, putting powder cocaine in the water, and, as the cocaine is boiling, sprinkling baking soda on the top of the boiling mixture. This brings out the impurities in the cocaine. The mixture is then filtered through a coffee filter. What stays on the coffee filter is a waxy soapy material which is the crack cocaine. (Tr.p. 568).

amount. However, Johnson testified that Stewart was in the apartment at that time and re-weighed the crack cocaine, and finding it of sufficient weight, directed Johnson to take his scale down to the car to demonstrate to Roberts that the crack cocaine weighed two ounces.

{¶14} Roberts conceded that the crack did weigh two ounces and that his scale must be broken. At the conclusion of this sale, Stewart appeared at the back door of 112 ½ East North Street, and yelled to Roberts that his scale was not working properly and told Roberts he should get a new scale. Tambasco testified that Johnson and Stewart sold Roberts 46.99 grams of crack cocaine on February 27, 2006. Audio and video tapes of this transaction were introduced and played for the jury.

{¶15} With respect to the drug purchases that occurred at 112 ½ East North Street, Detective Boyer also noted in his testimony that the location of 112 ½ East North Street was 499 feet from St. Wendelin Elementary School. David Lang, Parish Manager for St. Wendelin Parish and Schools also testified that St. Wendelin's Elementary School property abutted East North Street.

{¶16} The next transaction occurred on March 3, 2006. This time, Roberts arranged to purchase three and a half ounces of crack cocaine. When he called Johnson to make the purchase, she did not want to meet again at 112 ½ East North Street, saying that her house was "hot," meaning under watch by the police. (Tr.p.

1279). Also, both Roberts and Johnson were concerned about being robbed due to the large amount of money and drugs at issue in this transaction.

{¶17} Instead, Roberts picked up Johnson up at 175 Freemont Street in Fostoria and they drove around while he gave her $3,600 for 4.5 ounces of crack cocaine. Once the transaction was completed, Roberts dropped Johnson back off at 175 Freemont Street. Tambasco testified that this transaction involved 107.78 grams of crack cocaine. This transaction was recorded on both audio and videotape and played for the jury.

{¶18} After the March 3, 2006 purchase, Detective Boyer procured search warrants for both 811 N. Wood Street and 112 ½ East North Street. On March 14, 2006 Boyer and other officers executed the search warrants on 112 ½ East North Street and 811 N. Wood Street. Nothing was found in the Wood Street residence when it was searched.

{¶19} The warrant for 112 ½ East North Street was a document warrant, entitling officers only to search for documents. However, when officers entered the home, there were visible narcotics lying all around the kitchen. At that point, officers stopped searching until a search warrant authorizing the search for drugs was obtained and the search was continued.

{¶20} Additionally, upon entering the residence, Officers found Michael Thomas ("Thomas") asleep on the couch. Otherwise, 112 ½ East North Street

appeared to be unoccupied. However, it was later determined that Stewart and another male were hiding behind the furnace in a closet on the back porch at the time of the search, but were never found by officers. Johnson testified at trial that Stewart called her from his cell phone while police were searching the house. It appears, from all of the testimony given at trial that Stewart had just returned to the apartment prior to the police executing the search warrant. This can be inferred both from Johnson's testimony and the fact that drugs were scattered throughout the kitchen, despite the fact that drugs were usually kept out of sight in a bedroom dresser.

{¶21} Inside the residence at 112 ½ East North Street, officers found a total of 285.49 grams of powder cocaine, 272.43 grams of crack cocaine, 469.91 grams of marijuana, digital scales, cell phones, a box of .38 caliber bullets, two boxes of .22 caliber bullets, a .22 caliber pistol, a .40 caliber pistol, a Taurus 9 millimeter pistol, holster all attributable to Stewart. The amounts of the drugs found in 112 ½ East North Street were testified to by Matthew Congleton ("Congleton"), a forensic scientist with the Bureau of Criminal Identification and Investigation.

{¶22} These items were found throughout the apartment. However, many of the drugs were found in a dresser drawer where Johnson testified that she and Stewart kept their drugs and also in the kitchen, where Stewart likely placed them when he arrived at the apartment. Drugs were also found in a Kermit jacket which

Stewart is wearing in a photograph and which Johnson testified belonged to Stewart.

{¶23} With respect to who actually resided at 112 ½ East North Street, Johnson testified that although only her name was on the lease to 112 ½ East North Street, Stewart lived there with her, despite his frequent absences from the apartment. Johnson also testified that she and Stewart both sometimes stated that they lived at 110 ½ East North Street in order to avoid letting people know where they actually lived.

{¶24} Also, during the March 14, 2006 search of 112 ½ East North Street, Thomas, who was found sleeping on the couch, was charged with possession of 2.84 grams of crack cocaine found on his person at the time of the search.

{¶25} After the March 14, 2006 search, Detective Boyer was contacted by Corey McGhee ("McGhee"). McGhee was incarcerated and requested to speak to Detective Boyer in order to ask about getting consideration on his charges. At that time, McGhee was in the Seneca County Jail and upon meeting with Detective Boyer, told him that he could purchase drugs from Stewart, or another person involved in the enterprise, James Burris ("Burris").

{¶26} On March 25, 2006 Trooper Ricky L. Vitte, with the State Highway Patrol stopped a Chevy Lumina traveling eastbound on Lytle Street in Fostoria. Trooper Vitte stopped the Lumina because it was being operated too closely

behind the truck it was following. The driver of the vehicle was Taylor Novo ("Novo"). Stewart was in the front passenger seat and Darren Parks ("Parks") and William Lamar Jackson ("Jackson") were in the rear passenger area.

{¶27} When Trooper Vitte approached the vehicle, he noticed an odor of alcoholic beverage and also an odor of marijuana coming from the vehicle. Novo was asked to step out of the car and was subsequently given several field sobriety tests. Novo was placed under arrest for operating a vehicle under the influence of alcohol.

{¶28} Stewart was asked to step out of the vehicle and was asked if he had anything on his person. Stewart voluntarily supplied a small bag of marijuana that was concealed in his left sock. Stewart was also in possession of $1,200. Based on the odor of marijuana, the officers searched the vehicle.

{¶29} Due to Novo's intoxication and Stewart's possession of marijuana, they were taken to the police station. During the drive to the police station, Trooper Vitte testified that he observed Stewart laying back during the drive. Upon arrival at the station, Trooper Vitte pulled his cruiser into a "sally port" to unload the suspects. Trooper Vitte testified that the sally port was a clear area and that nothing was on the floor in the area. (Tr.p. 1825).

{¶30} Trooper Vitte then proceeded inside the station with Stewart. Upon returning to his cruiser, Trooper Vitte observed "just outside the right rear door,

there was a large plastic bag with six individually wrapped bags inside the larger bag." (Tr.p. 1826). Trooper Vitte then checked the back of the cruiser and proceeded back into the station to determine if anyone else had been in the sally port. He was informed that no one else had been in the sally port. The bag found in the sally port was analyzed by Heather Collins, a criminalist with the Ohio Highway Patrol Crime Lab, and determined to contain .666 grams of crack cocaine and 9.979 grams of powder cocaine.

{¶31} Another search was conducted on March 19, 2007. This time, the property searched was located at 303 East Lytle Street in Fostoria. After the search of 112 ½ East North Street on March 14, 2006, Johnson and Stewart moved to 303 East Lytle Street in order to avoid any further surveillance by police. It appears that Stewart and Johnson were in the habit of moving frequently. The search of 303 East Lytle Street began in the early hours of the morning, and when officers entered the home, they found Johnson in bed sleeping.

{¶32} During the search of 303 East Lytle Street, officers found 46.5 grams of crack cocaine in a blue bag in a closet off the dining room; also found in the blue bag were two bags of cocaine weighing 124.7 grams and 24.7 grams. Fifty-six tablets of MDMA,[3] a bag containing .4 grams of cocaine, 21.6 grams of psilocyn mushrooms were found in the dining room closet. Three hundred and

---

[3] MDMA, or methylenedioxymethamphetamine, is also known as ecstasy.

sixty-six grams of marijuana, 23.4 grams of marijuana packaged in small individual bags were found in some cardboard tubes on the dining room table, along with .5 grams of marijuana, 12.4 grams of marijuana, and digital scales. Also found during the search was marked currency supplied to a confidential informant and used in one of the drug purchases.

**{¶33}** Items identified as belonging to both Johnson and Stewart were found, including mail addressed to Stewart, at 303 East Lytle Street. Additionally, a .38 special revolver and ammunition were found in the bedroom. Johnson testified at trial that she slept with a gun under her pillow.

**{¶34}** On June 21, 2007 Stewart was indicted on twenty-five counts. The indictment was amended several times before trial with the final request to amend occurring on April 15, 2008. The amended indictment consisted of twenty-three counts as follows: Count 1 - Trafficking in Crack Cocaine, in violation of R.C. 2925.03(A)(1), (C)(4)(a), a felony of the fifth degree; Count 2 - Complicity to Trafficking in Crack Cocaine, in violation of R.C. 2923.03(A)(2) and R.C. 2925.03(A)(1),(C)(4)(d), a felony of the second degree; Count 3 - Complicity to Trafficking in Crack Cocaine, in violation of R.C. 2923.03(A)(2) and R.C. 2925.03(A)(1),(C)(4)(e), a felony of the first degree; Count 4 - Complicity to Trafficking in Cocaine, in violation of R.C. 2923.03(A)(2) and R.C. 2925.03(A)(1),(C)(4)(b), a felony of the fourth degree; Count 5 – Complicity to

Trafficking in Crack Cocaine, in violation of R.C. 2923.03(A)(2) and R.C. 2925.03(A)(1),(C)(4)(e), a felony of the first degree; Count 6 - Complicity to Trafficking in Cocaine, in violation of R.C. 2923.03(A)(2) and R.C. 2925.03(A)(1),(C)(4)(b), a felony of the fourth degree; Count 7 - Complicity to Trafficking in Crack Cocaine, in violation of R.C. 2923.03(A)(2) and R.C. 2925.03(A)(1),(C)(4)(f), a felony of the first degree; Count 8 - Complicity to Trafficking in Crack Cocaine, in violation of R.C. 2923.03(A)(2) and R.C. 2925.03(A)(1),(C)(4)(g), a felony of the first degree; Count 9 - Possession of Crack Cocaine, in violation of R.C. 2925.11(A), (C)(4)(f), a felony of the first degree; Count 10 - Possession of Cocaine, in violation of R.C. 2925.11(A),(C)(4)(d), a felony of the second degree; Count 11 - Possession of Marihuana, in violation of R.C. 2925.11(A),(C)(3)(c), a felony of the fifth degree; Count 12 - Possessing Criminal Tools, in violation of R.C. 2923.24(A), a felony of the fifth degree; Count 13 - Having a Weapon While Under Disability, in violation of R.C. 2923.13(A)(3), a felony of the third degree; Count 14 - Possession of Crack Cocaine in violation of R.C. 2925.11(A),(C)(4)(e), a felony of the first degree; Count 15 – Possession of Cocaine, in violation of R.C. 2925.11(A),(C)(4)(d), a felony of the second degree; Count 16 - Possession of Marihuana, in violation of R.C. 2925.11(A),(C)(3)(c), a felony of the fifth degree; Count 17 - Aggravated Possession of Drugs, in violation of R.C.

2925.11(A),(C)(1)(c), a felony of the second degree; Count 18 - Aggravated Possession of Drugs, in violation of R.C. 2925.11(A),(C)(1)(a), a felony of the fifth degree; Count 19 – Possessing Criminal Tools, in violation of R.C. 2923.24(A), a felony of the fifth degree; Count 20 - Possession of Cocaine in violation of R.C. 2925.11(A),(C)(4)(b), a felony of the fourth degree; Count 21 - Tampering With Evidence, in violation of R.C. 2921.12(A)(1), a felony of the third degree; Count 22 - Participating in Criminal Gang, in violation of R.C. 2923.42(A)(B), a felony of the second degree; and Count 23 - Engaging in a Pattern of Corrupt Activity, in violation of R.C. 2923.32(A)(1), a felony of the first degree. The Charge of Engaging in a Pattern of Corrupt Activity alleged numerous different incidents of corrupt activity beyond the indicted offenses. Additionally, Counts 2-7 of the indictment contained specifications alleging that the offenses were committed within the vicinity of a school, and Counts 8-9 contained Major Drug Offender specifications.

{¶35} Stewart was arrested on July 27, 2007. On July 30, 2007 Stewart was arraigned and pled not guilty to all counts of the indictment. Bond was set at $2,000,000.00, no 10%, cash or surety.

{¶36} A jury trial was held in this matter in April-May, 2008. At the conclusion of the trial, Stewart was found guilty on all twenty-three counts of the

indictment. Stewart was sentenced to a total prison term of thirty-six years and eleven months.

**{¶37}** Stewart now appeals, asserting three assignments of error.

**ASSIGNMENT OF ERROR I**
**THE TRIAL COURT VIOLATED MR. STEWART'S RIGHT TO CONFRONTATION BY ADMITTING TESTIMONIAL EVIDENCE OF OUT-OF-COURT DECLARANTS, THROUGH RECORDINGS AND POLICE OFFICER TESTIMONY.**

**ASSIGNMENT OF ERROR II**
**THE TRIAL COURT ABUSED ITS DISCRETION AND CONSTITUTIONALLY ERRED IN ADMITTING EVIDENCE OF CO-DEFENDANT GUILTY PLEAS AS SUBSTANTIVE EVIDENCE AGAINST MR. STEWART AND ADMITTING TESTIMONY THAT THE CONDUCT OF THE GUILTY PLEAS WAS THE SAME CONDUCT CHARGED AGAINST MR. STEWART IN THIS CASE.**

**ASSIGNMENT OF ERROR III**
**THE EVIDENCE WAS INSUFFICIENT TO SUPPORT THE GUILTY VERDICTS AS TO COUNTS NINE THROUGH 13, 22, AND 23, AND THOSE VERDICTS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

**{¶38}** For ease of discussion, we will address Stewart's assignments of error out of order.

*Third Assignment of Error*

**{¶39}** In his third assignment of error, Stewart argues that his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence. Reviewing a challenge to the sufficiency of the evidence requires

this Court to examine the evidence in the light most favorable to the prosecution. In *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, the Ohio Supreme Court set forth the sufficiency of the evidence test as follows:

> **[A]n appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial and determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.**

*Jenks*, 61 Ohio St.3d at 273.

{¶40} Alternatively, an appellate court's function when reviewing the weight of the evidence is to determine whether the greater amount of credible evidence supports the verdict. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541, 1997-Ohio-52. In reviewing whether the trial court judgment was against the weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting testimony. *Id.* In doing so, this court must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the factfinder "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Andrews* 3rd Dist. No. 1-05-70, 2006-Ohio-3764 citing *State v.*

*Martin* (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717; *Thompkins,* 78 Ohio St.3d at 387.

**{¶41}** It is important to remember that the credibility to be afforded the testimony of the witnesses is to be determined by the trier of fact. *State v. Dye* (1998), 82 Ohio St.3d 323, 329, 695 N.E.2d 763, 1998-Ohio-234; *State v. Frazier* (1995), 73 Ohio St.3d 323, 652 N.E.2d 1000, 1995-Ohio-235.

**{¶42}** In the present case, Stewart only argues as to the sufficiency and weight of the evidence supporting Count 9 – Possession of Crack Cocaine, Count 10 – Possession of Cocaine, Count 11 – Possession of Marihuana, Count 12 – Possessing Criminal Tools, Count 13 – Having a Weapon While Under Disability, Count 20 - Possession of Cocaine, Count 21 - Tampering With Evidence, Count 22 – Participating in Criminal Gang, and Count 23 – Engaging in a Pattern of Corrupt Activity.

**{¶43}** With respect to Counts 9-13, Stewart argues that there was not sufficient evidence introduced at trial to prove that he had possession of the items found at 112 ½ East North Street. Possession is defined as "having control over a thing or substance, but may not be inferred solely from mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is found." R.C. 2925.01(K); *State v. Smith,* 3d Dist. No. 8-04-40, 2005-Ohio-3233, ¶ 6. Courts have found constructive possession of drugs when

the evidence proves that the defendant was able to exercise dominion and control over the contraband. *State v. Wolery* (1976), 46 Ohio St.2d 316, 332, 348 N.E.2d 351. Dominion and control may be proven by circumstantial evidence alone. *State v. Trembly* (2000), 137 Ohio App.3d 134, 141, 738 N.E.2d 93.

**{¶44}** Stewart still contends that there was insufficient evidence introduced at trial to prove that he resided in the apartment at 112 ½ East North Street or that he had possession of the drugs found there. Specifically, Stewart relies on the testimony of Novo, who claimed that from February 2006 to August 2006, Stewart resided with her. However, Novo stated that during the time she resided with Stewart she worked third shift and was unclear in her testimony as to how often Stewart was actually home.

**{¶45}** Alternatively, Johnson testified that Stewart resided at the 112 ½ East North Street apartment with her. At trial, Johnson admitted that Stewart was often absent from the apartment they shared while he was getting more drugs from the Toledo area. Moreover, during the search of 112 ½ East North Street, officers found mail addressed to Stewart, using the 112 ½ East North Street address, including mail from Stewart's mother and a hospital bill where Stewart gave the 112 ½ East North Street address as his own. Additionally, Stewart admitted he lived at 112 ½ East North Street during a phone call with Thomas. Moreover, Greg Green, another Fostoria drug dealer testified that it was his practice to have

someone else put their name on an apartment lease, to avoid being charged if an apartment was ever raided. Green stated that was a common practice to protect oneself.

{¶46} Johnson also gave copious testimony concerning where Stewart kept the drugs in the apartment. Stewart brought the drugs into the house, determined prices, and handled the money. Johnson testified that Stewart had almost sole control over the drugs and the money. When Johnson made a drug sale, she did so at a price set by Stewart and then turned the money over to Stewart. Additionally, Johnson testified that she did not know how to cook the powder cocaine into crack cocaine, and that Stewart was responsible for cooking the crack with the supplies found in the home.

{¶47} Additionally, Johnson testified as to where Stewart was hiding during the drug raid of 112 ½ East North Street. It appears that Stewart had just returned to the apartment prior to the police executing the search warrant. This can be inferred both from Johnson's testimony and the fact that drugs were scattered throughout the kitchen, despite the fact that drugs were usually kept out of sight in a bedroom dresser. Stewart returned from one of his trips with more drugs, let himself and his friends into the apartment and set the drugs around the kitchen, it was reasonable for the jury to consider all of this testimony when

determining whether Stewart resided in the apartment at 112 ½ East North Street and controlled the drugs found during the search.

**{¶48}** Finally, testimony was given that numerous pictures of Stewart and his friends were found at 112 ½ East North Street. Stewart's clothing and shoes were found at 112 ½ East North Street, including the Kermit jacket in which drugs were found. Johnson also testified that the guns found in the apartment belonged to Stewart and were kept there for protection.

**{¶49}** It was within the province of the jury to believe Johnson. Moreover, it was a reasonable inference for the jury to choose to believe that Stewart was residing in the apartment with Johnson, and it would have been entirely reasonable for the jury to conclude that both Johnson and Novo believed Stewart was residing with them. Viewing all of the evidence, we cannot find that the jury clearly lost its way by finding that Stewart had possession of the drugs, weapons, and other items found at 112 ½ East North Street, or that there was otherwise insufficient evidence to establish Stewart's possession.

**{¶50}** Stewart also challenges the weight and sufficiency of his convictions for Count 20 – Possession of Cocaine and Count 21 – Tampering with Evidence. Specifically, Stewart argues that there was insufficient evidence that the bags of cocaine found just outside Trooper Vitte's patrol car belonged to Stewart.

{¶51} To establish constructive possession, the evidence must prove that the defendant was able to exercise dominion and control over the contraband. *State v. Wolery* (1976), 46 Ohio St.2d 316, 332, 348 N.E.2d 351. As previously stated, dominion and control may be proven by circumstantial evidence alone. *State v. Trembly* (2000), 137 Ohio App.3d 134, 141, 738 N.E.2d 93. Circumstantial evidence that the defendant was located in very close proximity to readily usable drugs may show constructive possession. *State v. Barr* (1993), 86 Ohio App.3d 227, 235, 620 N.E.2d 242, 247-248.

{¶52} Tampering with Evidence is defined in R.C. 2921.12 as follows:

**(A) No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall do any of the following:**

**(1) Alter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation . .**

{¶53} Trooper Vitte testified that nothing was located in the sally port prior to him entering the port, and that no one had access to the port while he took Stewart into the station and remained in the station. As previously stated, dominion and control may be proven by circumstantial evidence alone. *State v. Trembly* (2000), 137 Ohio App.3d 134, 141, 738 N.E.2d 93.

{¶54} Therefore, it was a logical conclusion for Trooper Vitte to reason that Stewart attempted to discard the drugs while he was fidgeting on the way to

the police station. Accordingly, we cannot find that the jury lost its way or otherwise could not have reached the same conclusion as to Stewart's ownership of the cocaine, and as to his intent to discard the cocaine in the sally port.

{¶55} We turn next to Stewart's challenge to Count 22 - Participation in a Criminal Gang. Participation in a Criminal Gang is defined by R.C. 2923.42(A) as follows:

> **No person who actively participates in a criminal gang, with knowledge that the criminal gang engages in or has engaged in a pattern of criminal gang activity, shall purposely promote, further, or assist any criminal conduct, as defined in division I of section 2923.41 of the Revised Code, or shall purposely commit or engage in any act that constitutes criminal conduct, as defined in division I of section 2923.41 of the Revised Code.**

{¶56} Other Ohio courts have found that, "[a]s applied to R.C. 2923.42(A), the common and ordinary meaning of 'actively participates in a criminal gang' is involvement with a criminal gang that is more than nominal or passive." *State v. Stallings*, 150 Ohio App.3d 5, 11, 778 N.E.2d 1110, 2002-Ohio-5942. The Ninth District Court of Appeals also found in *Stallings* that "for a defendant to be criminally liable under R.C. 2923.42(A), he would also have to be criminally liable as an aider or abettor to a crime committed by a fellow gang member or members." *Stallings*, 150 Ohio App.3d at 12.

{¶57} A criminal gang is defined by R.C. 2923.41 as follows:

> **(A) "Criminal gang" means an ongoing formal or informal organization, association, or group of three or more persons to which all of the following apply:**
>
> **(1) It has as one of its primary activities the commission of one or more of the offenses listed in division (B) of this section.**
>
> **(2) It has a common name or one or more common, identifying signs, symbols, or colors.**
>
> **(3) The persons in the organization, association, or group individually or collectively engage in or have engaged in a pattern of criminal gang activity.**

R.C. 2923.41(C) defines criminal conduct

> **"Criminal conduct" means the commission of, an attempt to commit, a conspiracy to commit, complicity in the commission of, or solicitation, coercion, or intimidation of another to commit, attempt to commit, conspire to commit, or be in complicity in the commission of an offense listed in division (B)(1)(a), (b), or (c) of this section or an act that is committed by a juvenile and that would be an offense, an attempt to commit an offense, a conspiracy to commit an offense, complicity in the commission of, or solicitation, coercion, or intimidation of another to commit, attempt to commit, conspire to commit, or be in complicity in the commission of an offense listed in division (B)(1)(a), (b), or (c) of this section if committed by an adult.**

{¶58} In the present case, both Johnson and Green, an admitted member of the Gear Gang Crips for a period of 14-15 years, identified Stewart as a member of the Gear Gang Crips. Moreover, the jury heard the testimony of Officer Doug Allen with the City of Toledo, Division of Police Gang Youth Crimes Unit. Officer Allen testified extensively about gang identification, and was certified as an expert in criminal gang identification. Allen testified that several people

involved in the investigation leading to Stewart's convictions were known by the Toledo Police as gang members, including: Stewart, McGhee, Burris, Aaron Hoskins, and Green.

{¶59} Alexa Johnson testified that Stewart had various tattoos that evidenced his identification with the Gear Gang Crips. In addition to Johnson's general testimony, Officer Allen also identified several of Stewart's tattoos as indicating membership in the Gear Gang Crips, including a tattoo of the number "773," a numerical representation of GGC, for Gear Gang Crips. (Tr.p. 2498).[4]

{¶60} During the time Stewart lived with Johnson, she testified that she knew that Thomas, Burris, Green, Chris Kincade, Hoskins and others who visited Stewart at the apartment were members of the Gear Gang Crips. Johnson also testified that these Gear Gang Crips members were also people to whom she and

---

[4] Allen testified that gang members often used numbers corresponding to the position of letters in the alphabet to abbreviate their gang names in numerical form, i.e. A=1, B=2, C=3 . . . G=7.

Stewart regularly supplied drugs. Detective Don Joseph also testified that Cory McGhee, a self-admitted member of the Gear Gang Crips identified those same people as being gang members. This information was corroborated by phone records introduced at trial, showing the interactions between all of the members of the Gear Gang Crips.

{¶61} Officer Allen also identified some of the photographs of Stewart and his friends, found in 112 ½ East North Street as depicting Stewart and others making gang symbols with their hands. Apparently, the pictures of Stewart and others were taken at night clubs, where patrons could choose to pose in front of various backdrops. In the pictures, Stewart and others are making gang symbols and in some cases, showing gang related tattoos. Johnson testified that she often knew Stewart to make gang symbols to show his participation in the Gear Gang Crips.

{¶62} Stewart was also engaged in drug sales with other members of the Gear Gang Crips. Detective Boyer testified at trial that Stewart was an upper level supplier of drugs. As Johnson stated, referring to herself and Stewart, when it came to drugs "everybody usually comes to us." (Tr.p. 1779). When asked to elaborate on who "everybody" referred to, Johnson named the following: Christopher Kincade, Marquette Dean, Ronald Johnson, Green, Leslee Delarosa

("Delarosa"), Derrick Noles, and Hoskins. In fact, Johnson testified as follows about the role she and Stewart played as drug suppliers:

> **Q. Okay. So what were you telling this guy when you said, you know, "everybody comes to us"? What did you mean as part of the conversation with him?**
>
> **A. Darrion - - me and Darrion, we were the main people that people bought drugs off of.**
>
> **Q. So you were the main people?**
>
> **A. Yes.**

(Tr.p. 1780).

{¶63} Johnson further testified that Stewart went to Toledo every other day to get cocaine; and that on each trip, Stewart would get 4.5 ounces of powder cocaine. Johnson testified that sometimes she would go with Stewart to get the powder cocaine from Toledo, but that sometimes she would stay in Fostoria to sell the cocaine that they already had. Johnson stated that James Burris ("Burris") or Thomas would then accompany Stewart to Toledo to get drugs if Johnson did not go with him.

{¶64} Johnson also testified that she and Stewart regularly sold drugs to Greg Green and Leslee Delarosa. Johnson testified that she would supply drugs to Green and Delarosa every day. Johnson also testified that she and Stewart supplied Ronald Johnson, Marquette Dean, Aaron Hoskins, and Anthony McDuffey with drugs every day or every other day. Johnson also named

numerous others who she and Stewart supplied less frequently including Shane McDuffey, Corey McGhee, William Jackson, Christopher Kincade, and Taneel Lee.

**{¶65}** Stewart was also aware that the persons he was supplying with drugs were selling drugs. Leslee Delarosa testified that she and Green would purchase drugs from Stewart or Johnson and then turn around and sell those drugs. Delarosa stated that Stewart was aware that she was selling the drugs she purchased from him, and that sometimes, she would sell drugs with Stewart. Delarosa testified that Stewart started out selling drugs on the street, but stopped, as follows:

> **Q. . . . Describe for us, if you know, why the defendant quit selling drugs on the street?**
>
> **A. Because he started getting larger amounts of crack and everybody bought dope off of him so there was no need for him to on the street.**
>
> **Q. When you say "everybody bought dope off of him", can you explain who you mean when you say everybody?**
>
> **A. I mean, like, all of my co-defendants, from Anthony McDuffey, Gregory Green, myself, uhm, Ronald Johnson, uhm, Marquette Dean, uhm. .**

(Tr.p. 2161-2162).

**{¶66}** Delarosa was also able to testify as to what other co-defendants did with the drugs they purchased from Stewart and Johnson:

**Q.** **. . . if you know personally, what Mr. Hoskins did with any drugs he would've bought from the defendant.**

**A.** **Selling 'em.**

**Q.** **And where did Mr. Hoskins sell his drugs?**

**A.** **North Poplar Street and Echo Village.** [5]

**\*\*\***

**Q.** **Do you have any personal knowledge of what Mr. Dean would do with the drugs he bought from the defendant?**

**A.** **Sell 'em**

(Tr.p. 2166-2168).

**Q.** **Did you ever see any drug transaction between the defendant and Derrick Noles?**

**\*\*\***

**A.** **Yes. Yes, I have.**

**Q.** **How many times would you say you've seen drug transactions between the defendant and Derrick Noles?**

**A.** **About five times.**

**Q.** **And describe for us what those transactions consisted of?**

**\*\*\***

**A.** **Derrick Noles was buying dope from Darrion Stewart.**

**Q.** **And what quantities?**

---

[5] Throughout the record, in the present case, the Fostoria Townhouses are also referred to as Echo Village.

A.    Balls.

Q.    Do you know what, uhm, Mr. Noles did with the crack that he bought from the defendant?

A.    Sold it.

Q.    Where did he sell it?

A.    Out at Echo.

(Tr.p. 2172-2173).

Q.    And how do you know Michael Thomas?

A.    Uhm, I bought weed off of him.

***

Q.    Did you ever see Mr. Thomas with the Defendant?

A.    Yes.

***

Q.    Did you ever see any drug transaction between Michael Thomas and the defendant?

A.    Uhm, I've seen Michael Thomas buy marijuana off of 'em.

***

Q.    What - - what, if you know, did Michael Thomas do with the drugs he bought from the defendant?

A.    Sold it.

(Tr.p. 2173-2175).

**Q. Did you ever see any drug transactions between Ronald Johnson and the defendant?**

**A. Yes, I have.**

**Q. What kind of transactions.**

**A. Crack and weed.**

**\*\*\***

**Q. Do you know what Ronald Johnson did with the drugs he bought from the defendant?**

**A. He sold them.**

**Q. And where at?**

**A. Echo and North Poplar Street.**

(Tr.p. 2176-2177).

{¶67} Delarosa testified that Anthony McDuffey also bought drugs, specifically, crack cocaine and marijuana off of Stewart. McDuffey would then sell these drugs at Echo Village and North Poplar Street. (Tr.p. 2178).

{¶68} According to Johnson, Stewart was a local supplier of drugs during 2006-2007 in Fostoria. The other supplier was Burris. Stewart testified that if they did not have the drugs requested by a customer at a given time, they would send them to Burris, who would usually be at the Fostoria Townhouses selling drugs out of his home there. Johnson stated that there were times where she and Stewart would get marijuana from Burris.

{¶69} Accordingly, we cannot find that the jury lost its way or that there was otherwise insufficient evidence to establish that Stewart was a member of a criminal gang and was participating in criminal conduct with that gang, as the testimony at trial clearly indicated that Stewart was engaged in the business of selling drugs with other members of the Gear Gang Crips.

{¶70} Stewart was also convicted of one count of Engaging in a Pattern of Corrupt Activity, which alleged numerous instances of corrupt activity. Engaging in a Pattern of Corrupt Activity is defined by R.C. 2923.32(A)(1), as follows:

> **(A)(1) No person employed by, or associated with, any enterprise shall conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity or the collection of an unlawful debt.**

R.C. 2923.31(I) defines "enterprise" as the following:

> **any individual, sole proprietorship, partnership, limited partnership, corporation, trust, union, government agency, or other legal entity, or any organization, association, or group of persons associated in fact although not a legal entity. 'Enterprise' includes illicit as well as licit enterprises.**

Finally, R.C. 2923.31(E) defines "pattern of corrupt activity" to mean:

> **two or more incidents of corrupt activity, whether or not there has been a prior conviction, that are related to the affairs of the same enterprise, are not isolated, and are not so closely related to each other and connected in time and place that they constitute a single event.**

{¶71} R.C. 2923.32 defines "corrupt activity" as "engaging in, attempting to engage in, conspiring to engage in, or soliciting, coercing, or intimidating another person to engage in * * * conduct constituting" one of the predicate offenses listed in R.C. 2923.31(I)(2). See, *State v. Adkins*, 136 Ohio App.3d 765, 737 N.E.2d 1021, 2000-Ohio-1656; *State v. Schlosser*, 79 Ohio St.3d 329, 335, 681 N.E.2d 911, 915-916, 1998-Ohio-716.

{¶72} Stewart was charged, in his indictment with numerous instances of corrupt activity, including both charged and uncharged conduct. Some of the conduct was proven through introduction of a judgment entry of conviction. In Seneca County Common Pleas Court Case No 10295, Stewart was convicted of one count of Possession of Crack Cocaine, in violation of R.C. 2925.11, a felony of the fourth degree. A copy of this judgment was introduced and Stewart was identified.

{¶73} In Wood County Common Pleas Court case number 04CR0247, Stewart was convicted of Trafficking in Cocaine, in violation of R.C. 2925.03, a felony of the third degree. A copy of Stewart's conviction in case number 04CR0247 was submitted into evidence and Stewart was identified. Detective Boyer also testified that the Wood County conviction would be sufficient to place Stewart under disability where he could not legally own a firearm.

{¶74} Conduct charged in the previous counts of the indictment was also charged in the indictment as instances of corrupt activity, including the aiding and abetting of Johnson in the sale of various drugs as charged in Counts 2-8 of the indictment. Conduct relating the search of 112 ½ North East Street was also charged as an instance of corrupt activity, where Johnson and Stewart were jointly in possession of the drugs found at 112 ½ East North Street.

{¶75} Moreover, Stewart engaged in numerous other instances of corrupt activity with other conspirators. As previously stated, Stewart was an upper level drug supplier, responsible for supplying many of the street level drug dealers in Fostoria. Ralph McCray, a confidential informant made two controlled drug purchases from persons outside of the Fostoria Townhouses. While making those purchases, McCray was working with Detective Boyer and Detective Jason Windsor. It was later determined that Ronald Johnson and Marquette Dean sold .14 grams of crack cocaine to McCray on August 9, 2006. During that time period, it was testified to that Ronald Johnson and Dean purchased their supply of crack cocaine from Stewart.

{¶76} Testimony was also given that in August 2006 Burris and another male were reported, by an informant, to be heading southbound on Interstate 75 (I-75), toward Fostoria in a green Marquis. Prior to this occasion, on August 30, 2006 Burris and Stewart were stopped, heading north on I-75 in this same vehicle.

Upon approaching the vehicle, Stewart was found to be covered in "shake," which is a name given to small pieces of marijuana that may fall out of a bag of marijuana or marijuana cigarette. Stewart was also found to have over $1,600 on his person at the time of the stop. Stewart received a minor misdemeanor citation for the possession of marijuana.

{¶77} Although numerous other instances of corrupt activity were charged and proven, as Stewart conceded in his brief "Mr. Stewart may very well have been guilty of individual drug sales and some sort of business relationship with Johnson." In fact, the business relationship with Johnson would alone be sufficient to convince the average mind of Stewart's guilt of Engaging in a Pattern of Corrupt Activity beyond a reasonable doubt. Accordingly, this Court cannot find that the jury lost its way in finding Stewart guilty of the offense or that the evidence was otherwise insufficient. Accordingly, Stewart's third assignment of error is overruled.

*First Assignment of Error*

{¶78} In his first assignment of error, Stewart argues that the trial court erred in admitting video and audio recordings of persons who did not testify at trial because these admissions violated the Confrontation Clause. Specifically, Stewart argues that the trial court erred in allowing Detective Boyer to testify to statements made by co-conspirator Corey McGhee and in allowing a tape to be

played of calls made by co-conspirator Michael Thomas from jail. In his reply brief, Stewart argues that he is challenging "each and every instance the trial court admitted testimonial statements in violation of the Confrontation Clause." However, Stewart did not make any argument with respect to all of these claimed additional errors, as required by Appellate R. 16.[6] Accordingly, all of Stewart's alleged other instances will be discussed only generally.

{¶79} As an initial matter we note that decisions regarding the admissibility of evidence are within the sound discretion of the trial court and will not be reversed absent a showing of an abuse of discretion. *State v. Yohey* (March 18, 1996), 3d Dist. No. 9-95-46, citing *State v. Graham* (1979), 58 Ohio St.2d 350, 390 N.E.2d 805 and *State v. Lundy* (1987), 41 Ohio App.3d 163, 535 N.E.2d 664. An abuse of discretion "connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable." *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 450 N.E.2d 1140.

---

[6] App. R. 16 requires the following components to be included in an Appellant's brief:

> **(3) A statement of the assignments of error presented for review, with reference to the place in the record where each error is reflected.**
> **\*\*\***
> **(7) An argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies. The argument may be preceded by a summary.**

Although Stewart states that he was prohibited by the page limitation from doing more than providing examples of his claimed error, we note that Stewart did not even attempt to seek an extension of the page limitation. Nor, did Stewart provide even a general list of his claimed errors.

{¶80} The Sixth Amendment provides in pertinent part: "in all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him * * *." Sixth Amendment to the United States Constitution; *State v. Stahl,* 111 Ohio St.3d 186, 189, 855 N.E.2d 834, 2006-Ohio-5482.

{¶81} In *Crawford v. Washington* (2004), 541 U.S. 36, 68, 124 S.Ct. 1354, the United States Supreme Court held that "[w]here testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross examination." The United States Supreme Court did not define the term "testimonial," but instead gave examples including: "all ex-parte in-court testimony or its functional equivalent, extrajudicial statements contained in formalized testimonial materials" (e.g., affidavits, depositions, prior testimony, confessions); and a class of statements that are made "under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *State v. Muttart,* 116 Ohio St.3d 5, 17, 875 N.E.2d 944, 2007-Ohio-5267, citing *Stahl*, 111 Ohio St.3d at 191, quoting *Crawford,* 541 U.S. at 51-52. After *Crawford*, the key issue under the Confrontation Clause is whether a statement is testimonial in nature. See *Muttart,* 116 Ohio St.3d 5, ¶ 59 (only testimonial statements implicate the Confrontation Clause).

**{¶82}** The *Muttart* Court recognized that "'[w]here nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law-as does *Roberts,* and as would an approach that exempted such statements from Confrontation Clause scrutiny all together.'" *Muttart,* 116 Ohio St.3d 5 citing *Stahl,* 111 Ohio St.3d at 190, and *Crawford,* 541 U.S. at 68; see also *Davis v. Washington* (2006), 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224. "In fact, in the wake of *Davis* there is a significant question about whether the Confrontation Clause analysis applies to nontestimonial statements." *Muttart,* 116 Ohio St.3d at 16-17.

**{¶83}** The United States Supreme Court, in *Davis*, found that with respect to testimonial statements, "[o]nly statements of this sort cause the declarant to be a "witness" within the meaning of the Confrontation Clause. It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." *Davis*, 547 U.S. at 821 (internal citations omitted).

**{¶84}** Accordingly, in *Davis*, the United States Supreme Court formulated what courts around the country have come to refer to as the primary-purpose test (see, e.g., *People v. Geier* (2007), 41 Cal.4th 555, 61 Cal.Rptr.3d 580, 161 P.3d 104; *State v. Kirby* (2006), 280 Conn. 361, 908 A.2d 506; *State v. Siler*, 116 Ohio St.3d 39, 876 N.E.2d 534, 2007-Ohio-5637). "Statements are nontestimonial when

made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Davis*, 547 U.S. at 822.

**{¶85}** Stewart's claimed errors can be broken down into three categories of evidence: statements of co-conspirators to law enforcement, recordings of drug transactions, and recordings of co-conspirators' phone calls from jail. We turn first to the statements of co-conspirators to law enforcement, specifically, the statements of Corey McGhee. McGhee was incarcerated on his own charges when he requested to speak with Detective Boyer. In order to get consideration for his charges, McGhee offered to assist in the State's investigation of Stewart. At trial, Boyer testified that McGhee told him that he could purchase drugs from either Stewart or Burris.

**{¶86}** Specifically, McGhee's statements to Detective Boyer were given in the context of how McGee became a confidential informant in this case. We are especially mindful that, McGhee approached law enforcement, and made statements, not as testimony or formal statements, but as a request to help to get consideration for his charges. Accordingly, because hearsay is defined as "a

statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted," and McGhee's statement was not offered to prove the truth of the matter asserted, but instead, how he became involved in the investigation, the confrontation clause is not implicated. See Evid. R. 801(C); *State v. Stiles*, 3rd Dist. No. 1-08-12, 2009-Ohio-89. Moreover, we cannot find these statements testimonial in nature.

{¶87} The same analysis also applies to another statement McGhee made to Detective Boyer, which was made after one undercover drug purchase was made, but prior to the start of a second purchase. Specifically, Detective Boyer testified that he received a call from McGhee. McGhee stated that Burris would be arriving in Fostoria with approximately nine ounces of cocaine or crack cocaine. Detective Boyer testified that he responded to McGhee's assertion by telling McGhee to call him when Burris arrived back in Fostoria.

{¶88} After McGhee made contact with Detective Boyer, Burris' car was subsequently stopped and drugs were recovered. Again, we find that in this case, McGhee's statements were not introduced for the truth of the matter asserted, but instead were introduced to explain why Detective Boyer had reason to stop Burris' car and were not made in anticipation of any litigation or made under the assumption that they would be used in litigation.

{¶89} Next, we turn our attention to the recordings of drug transactions which were introduced at trial. As an initial matter, we note that Stewart does not point to any one statement made during a drug transaction in this case, or any specific transaction which would violate the confrontation clause. Instead, Stewart generally claims that statements contained in these recordings may violate the confrontation clause.

{¶90} In our review of the recordings of drug transactions introduced at trial, we find the contents of those records to be solely concerned with the drug transaction at hand, or future transactions. Other Ohio Courts have considered such recordings and held that "the tape recordings of the actual drug transactions are not hearsay." *State v. Sloan*, 8th Dist. No. 79832, 2002-Ohio-2669. Moreover, federal courts have uniformly held that the introduction of such tapes does not violate the Confrontation Clause or any evidence rules governing hearsay. Such statements are merely necessary to establish the context of the defendant's statements and responses, and therefore are not offered to prove the truth of the matter asserted. *United States v. Price* (11th Cir.1986), 792 F.2d 994, 996; *United States v. Lemonakis* (D.C.Cir.1973), 485 F.2d 941, 948, cert. denied (1974), 415 U.S. 989. See also *State v. Hill* (Dec. 31, 1990), Fifth Dist. No. CA-8094. Consequently, we can find no confrontation clause violation stemming from the introduction of the recordings of drug transactions.

{¶91} Turning next to the recorded phone calls made by various co-conspirators from jail, we note that five calls made by Michael Thomas and one call made by McGhee were introduced at trial. The call made by McGhee was made on January 15, 2006 to his mother's home, where McGhee spoke with his brother. At the time of the call, McGhee was incarcerated in the Seneca County Jail on a charge for Possession of Cocaine. In that call, McGhee talked about Stewart "cornering the market." (Tr.p. 1068).

{¶92} Calls were made by Thomas on March 21, 2006, March 24, 2006 and March 31, 2006 while he was incarcerated in the Seneca County Jail on charges of Possession of Crack Cocaine. That charge resulted out of the March 14, 2006 search of 112 ½ East North Street, at which time Thomas was searched and found in possession of crack cocaine.

{¶93} One of the March 21, 2006 phone calls was to Stewart. During that call, Thomas and Stewart discussed getting a lawyer for Thomas. They also discussed the search of 112 ½ East North Street on March 14, 2006. At the time of the search, Thomas was asleep on the couch. Stewart also admitted that he was in 112 ½ East North Street, hiding on the back porch, in a closet, at the time of the search. Officers checked the closet, but found the door knob locked and assumed that no one was in the closets, or that those areas belonged to other apartments in the building.

{¶94} Thomas and Stewart also discussed their idea that neither of them could be charged with respect to the drugs found in 112 ½ East North Street because neither of their names were on the lease. However, Stewart admitted, on the call, that his address was "112," "and a half," "yeah." (Tr.p. 968). Thomas made another call to Stewart on March 21, 2006 where they discussed mostly social plans and people they knew. The third call on March 21, 2006 was made to Thomas' mother and involved a discussion of family matters and Stewart's plans to get him a lawyer.

{¶95} The March 24, 2006 and March 31, 2006 calls were made to Burris. During those calls, Thomas expressed his dissatisfaction with Stewart's failure to get him a lawyer. Those calls did not contain much additional information.

{¶96} We cannot find that these recorded calls are testimonial in nature. Nothing indicates that "the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution," as required by *Davis*, 547 U.S. at 822. In fact, none of the evidence Stewart claims was admitted in violation of the Confrontation Clause is testimonial in nature. Therefore, no Confrontation Clause violation can result. Accordingly, Stewart's first assignment of error is overruled.

*Second Assignment of Error*

**{¶97}** In his second assignment of error, Stewart argues that the trial court erred in admitting evidence of his co-conspirator's guilty pleas. As previously noted, decisions regarding the admissibility of evidence are within the sound discretion of the trial court and will not be reversed absent a showing of an abuse of discretion. *State v. Yohey* (March 18, 1996), 3d Dist. No. 9-95-46, citing *State v. Graham* (1979), 58 Ohio St.2d 350, 390 N.E.2d 805 and *State v. Lundy* (1987), 41 Ohio App.3d 163, 535 N.E.2d 664. An abuse of discretion "connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable."

**{¶98}** It is a long-standing rule that information that a co-defendant has pleaded guilty to or has been convicted of an offense stemming from the same facts or circumstances forming the basis of a prosecution against another is inadmissible as proof against the other. See *Kazer v. Ohio* (1831), 5 Ohio 280, 281-282, 1831 WL 97. This is because evidence that another pleaded guilty to or was convicted of an offense stemming from the same facts or circumstances is not necessarily evidence that the other committed the same offense. *Id.*

**{¶99}** However, this is not to say that evidence of a co-defendant's guilty plea is never admissible. In some circumstances, evidence of a co-defendant's guilty plea may go to the jury if its use is limited to other purposes such as

-44-

impeachment, see, e.g., *United States v. King* (C.A.5, 1974), 505 F.2d 602, or to show that the state has nothing to hide in its plea agreements. See, e.g., *United States v. Hilton* (C.A.11, 1985), 772 F.2d 783, 787.

**{¶100}** The test most often used to determine the admissibility of a co-defendant's guilty plea was set forth in *United States v. Casto (C.A.5,* 1989), 889 F.2d 562, 567, and requires the court to consider (1) whether a limiting instruction was given, (2) whether there was a proper purpose in introducing the fact of the guilty plea, (3) whether the plea was improperly emphasized or used as substantive evidence of guilt, and (4) whether the introduction of the plea was invited by defense counsel." *State v. Smith*, 148 Ohio App.3d 274. 275-276, 772 N.E.2d 1225, 2002-Ohio-3114.

**{¶101}** In the present case, numerous indictments, pleas, and sentences were introduced at trial. However, we note that these documents were not introduced per se as substantive evidence of Stewart's guilt. Instead, these documents were introduced to show the behavior of co-defendants in proving an enterprise engaged in corrupt activity. For example, information concerning a co-defendant was not introduced to show that because a co-defendant sold drugs, Stewart must have as well. Instead, the information was introduced to show that Stewart sold drugs to a particular co-defendant, who then went and sold drugs to

someone else, proving an enterprise engaging in a pattern of corrupt activity and also that Stewart was part of a criminal gang engaged in criminal conduct.

{¶102} Johnson and Delarosa testified that Stewart and Burris were the sole suppliers of drugs to certain persons in the Fostoria area during the time period covered by this case. They also testified who Stewart sold drugs to, and those persons turned around and re-sold those drugs. Therefore, copies of co-defendant's guilty pleas were reasonably introduced to show the admitted conduct of these co-defendants with the drugs they purchased from Stewart. Finally, almost all of the information introduced through the indictments, pleas, and sentencing documents of other co-defendants was corroborated through independent testimony and would have been before the jury regardless of the introduction of these documents.

{¶103} For example, Johnson, Delarosa, and Green all testified to their own criminal conduct at trial. All gave detailed descriptions of their drug dealings, and admitted that in exchange for their testimony, they had received some consideration for their charges. In addition to their own criminal conduct, Johnson, Delarosa, and Green testified to the general drug selling habits of other co-defendants including: Michael Thomas, Aaron Hoskins, Anthony McDuffey, Gregory Green, William Jackson, John White, Marquette Dean, Christopher Kincade, Corey McGhee, and Ronald Johnson.

{¶104} At trial, Delarosa offered substantial testimony regarding the end-effects of Stewart's drug enterprise. Particularly, Delarosa testified that after Stewart sold drugs to each of these co-defendants they broke down the drugs into smaller quantities and re-sold the drugs. Delarosa's testimony implicates these co-defendants as part of an enterprise conducting criminal activity.

{¶105} We are also mindful that, when we are considering a charge of Engaging in a Pattern of Corrupt Activity, the State is required to prove that a person, associated with an enterprise, either directly or indirectly engaged in a pattern of corrupt activity. In the present case, the State did not only allege Stewart's direct participation in corrupt activity, but also alleged his indirect participation through the resale of the drugs he sold to other co-defendants.

{¶106} The Ohio Supreme Court has held that,

**Offenses under RICO, R.C. 2923.32, are *mala prohibita, i.e.,* the acts are made unlawful for the good of the public welfare regardless of the state of mind. Thus, we agree with the Twelfth District's reasoning in *State v. Haddix* (1994), 93 Ohio App.3d 470, 638 N.E.2d 1096, which stated, "Whether a defendant knowingly, recklessly or otherwise engages in a pattern of corrupt activity, the effect of his activities on the local and national economy is the same. Requiring the finding of a specific culpable mental state for a RICO violation obstructs the purpose of the statute * * *." *Id.* at 477, 638 N.E.2d at 1101. Given these goals, we believe that the General Assembly intended to enhance the government's ability to quell organized crime by imposing strict liability for such acts.**

*State v. Schlosser*, 79 Ohio St.3d 329, 333.

{¶107} "To obtain convictions, [the state] had to prove that each defendant was voluntarily connected to that pattern and performed at least two acts in furtherance of it." *State v. Schlosser,* 79 Ohio St. 3d at 334 citing *United States v. Palmeri* (C.A.3, 1980), 630 F.2d 192, 203. The RICO statute was designed to impose cumulative liability for the criminal enterprise. *State v. Schlosser,* 79 Ohio St. 3d at 334.

{¶108} Therefore, it was essential that the State prove Stewart associated with the enterprise. However, it was not essential that the State prove Stewart knew of every instance of corrupt activity stemming from his corrupt activity, i.e. that he knew of every drug sale that resulted from his drug sales. In the present case, the State alleged Stewart's indirect participation in corrupt activity through the "enterprise" of the Gear Gang Crips and others he was associated with through drug sales. Therefore, the convictions of those Stewart supplied with drugs, during the period testimony was given to establish that Stewart was these persons' main supplier of drugs was directly relevant to Stewart's indirect participation with the extended criminal enterprise that was involved in selling drugs in Fostoria.[7] Accordingly, we cannot find that the trial court abused its discretion in

---

[7] This Court has asserted on several occasions that although not required, the introduction of a judgment entry of conviction is the preferred method of proving a predicate offense related to a charge of Engaging in a Pattern of Corrupt Activity. See *State v. Lightner*, 3rd Dist. No. 6-08-15, 2009-Ohio-2307; *State v. Lightner*, 3rd Dist No. 6-08-11 2009-Ohio-544.

allowing the introduction of the guilty pleas of Stewart's co-defendants and Stewart's second assignment of error is overruled.

{¶109} Based on the foregoing, the May 14, 2008 Judgment Entry of the Court of Common Pleas, Seneca County, Ohio sentencing Stewart to a total prison term of thirty-six years and eleven months for his conviction on twenty-three charges is affirmed.

*Judgment Affirmed*

**PRESTON, P.J. and WILLAMOWSKI, J., concur.**

**/jlr**