[Cite as *State v. McGhee*, 2009-Ohio-4259.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SENECA COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                 CASE NO. 13-08-12

    v.

COREY K. McGHEE,                      O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Seneca County Common Pleas Court
Trial Court No. 07-CR-0172

Judgment Affirmed

Date of Decision:     August 24, 2009

APPEARANCES:

    *Todd A. Workman*  for Appellant

    *Derek W. DeVine*  for Appellee

**PRESTON, P.J.**

{¶1} Defendant-appellant, Corey K. McGhee (hereinafter "McGhee"), appeals the Seneca County Court of Common Pleas' judgment of conviction. We affirm.

{¶2} On June 21, 2007, the Seneca County Grand Jury indicted McGhee on twelve counts, including: count one (1) of trafficking in crack cocaine in violation of R.C. 2925.03(A)(1),(C)(4)(a), a fifth degree felony; count two (2) of possession of crack cocaine in violation of R.C. 2925.03(A),(C)(4)(a),[1] a fifth degree felony; counts three (3), seven (7), and ten (10) of possessing criminal tools, violations of R.C. 2923.24(A) and fifth degree felonies; counts four (4) and five (5) of complicity to trafficking in crack cocaine, violations of R.C. 2923.03(A)(2) and R.C. 2925.03(A)(1), (C)(4)(a) and fifth degree felonies; count (6) of possession of marijuana in violation of R.C. 2925.11(A),(C)(3)(c), a fifth degree felony; count eight (8) of complicity to trafficking crack cocaine in violation of R.C. 2923.03(A)(2) and R.C. 2925.03(A)(1),(C)(4)(c), a fourth degree felony; count nine (9) of possession of cocaine in violation of R.C. 2925.11(A),(C)(4)(c), a third degree felony; count eleven (11) of participating in a criminal gang in violation of R.C. 2923.42(A), a second degree felony; and count

---

[1] Count two was subsequently amended to provide the correct revised code section for drug possession, R.C. 2925.11(A),(C)(4)(a). (See e.g. Mar. 27, 2008 Verdict Hearing Tr. at 4).

twelve (12) of engaging in a pattern of corrupt activity, with two specifications, in violation of R.C. 2923.32(A)(1), a first degree felony. (Doc. No. 1).

**{¶3}** These charges were assigned case no. 07-CR-0172. (Id.). The State also had two other cases against McGhee, case nos. 06-CR-0222 and 07-CR-0237. McGhee pled guilty to possession of cocaine in case no. 06-CR-0222, and the trial court continued his bond pending a pre-sentence investigation. (Apr. 5, 2007 Plea Hearing Tr., case no. 06-CR-0222). Subsequent to his guilty plea in case no. 06-CR-0222 and while still on bond, McGhee fled the State of Ohio, so the State charged McGhee for failing to appear in violation of R.C. 2937.29, R.C. 2937.99(A), which was assigned case no. 07-CR-0237. (Apr. 15, 2008 Plea of Guilty & Sentencing Hearing Tr. at 3, 13). On April 15, 2008, McGhee pled guilty in both cases, pursuant to a new plea agreement, and the trial court sentenced him to twelve (12) months in case no. 06-CR-0222 and eighteen (18) months in case no. 07-CR-0237. (Id. at 14). The trial court ordered that the terms be served concurrent to each other, but consecutive to the sentences imposed in the case before us, no. 07-CR-0172. (Id.); (Apr. 16, 2008 JE, Doc. No. 133).

**{¶4}** With regard to case no. 07-CR-0172, a ten-day bench trial was held on March 10-21, 2008. (Doc. No. 107). After hearing all the evidence, the trial court found McGhee guilty on all twelve (12) counts and sentenced him to a total of sixteen (16) years and five (5) months imprisonment. (Doc. Nos. 131, 133).

{¶5} On May 15, 2008, McGhee filed a notice of appeal in case no. 07-CR-0172, which was assigned appellate case no. 13-08-12. (Doc. No. 143). McGhee also filed notices of appeal with regard to case nos. 06-CR-0222 and 07-CR-0237, originally assigned appellate case nos. 13-08-11 and 13-08-13 respectively; however, this Court dismissed these two appellate cases following appointed counsel's filing of an *Ander*'s brief. However, with respect to case no. 07-CR-0172, appellate case no. 13-08-12, this Court found that there were possible appealable issues. As a result, new appellate counsel was appointed to submit an appeal in case no. 07-CR-0172 (appellate case no. 13-08-12), which is the subject of this present appeal.

{¶6} McGhee now appeals his convictions in case no. 07-CR-0172 asserting three assignments of error for our review. We elect to address McGhee's assignments of error out of the order they appear in his brief to this Court.

### ASSIGNMENT OF ERROR NO. III

**THE TRIAL COURT ERRED IN NOT FINDING INSUFFICIENT EVIDENCE TO SUPPORT THE CONVICTIONS AND FURTHER ERRED WHEN IT FOUND APPELLANT GUILTY AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

{¶7} In his third assignment of error, McGhee argues that his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence. McGhee alleges that the State failed to present sufficient evidence

on specific elements of each offense. We will address McGhee's specific arguments.

**{¶8}** As an initial matter, McGhee failed to move for a Crim.R. 29(A) motion for acquittal; and therefore, he has waived all but plain error with regard to the sufficiency of the evidence. (Mar. 10-21, 2008 TR. at 1764, 1781-82); *State v. Robinson*, 177 Ohio App.3d 560, 2008-Ohio-4160, 895 N.E.2d 262, ¶18, citations omitted. We recognize plain error "'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *State v. Landrum* (1990), 53 Ohio St.3d 107, 110, 559 N.E.2d 710, quoting *State v. Long* (1978) 53 Ohio St.2d 91, 372 N.E.2d 804, paragraph three of the syllabus. Under the plain error standard, the appellant must demonstrate that the outcome of his trial would clearly have been different but for the trial court's errors. *State v. Waddell* (1996), 75 Ohio St.3d 163, 166, 661 N.E.2d 1043, citing *State v. Moreland* (1990), 50 Ohio St.3d 58, 552 N.E.2d 894.

**{¶9}** On the other hand, in determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'[weigh] the evidence and all reasonable inferences, consider the credibility of witnesses and [determine] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins*

(1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717. A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass* (1967), 10 Ohio St.2d 230, 231, 227 N.E.2d 212.

{¶10} With regard to counts one through three, McGhee argues that the State failed to present evidence linking him to the Fostoria Hotel room where a confidential informant ("C.I.") purchased drugs. Count one charged McGhee with trafficking in crack cocaine in violation of R.C. 2925.03(A)(1),(C)(4)(a); count two charged McGhee with possession of crack cocaine in violation of R.C. 2925.11; and count three charged McGhee with possessing criminal tools in violation of R.C. 2923.24(A). (Doc. No. 1). R.C. 2925.03(A)(1),(C)(4)(a) provides:

> **(A)  No person shall knowingly do any of the following:**
>
> **(1)  Sell or offer to sell a controlled substance;**
>
> **(C)  Whoever violates division (A) of this section is guilty of one of the following:**
>
> **(4) If the drug involved in the violation is cocaine or a compound, mixture, preparation, or substance containing cocaine, whoever violates division (A) of this section is guilty of trafficking in cocaine. The penalty for the offense shall be determined as follows:**

**(a) Except as otherwise provided in division (C)(4)(b), (c), (d), (e), (f), or (g) of this section, trafficking in cocaine is a felony of the fifth degree, and division (C) of section 2929.13 of the Revised Code applies in determining whether to impose a prison term on the offender.**

R.C. 2925.11 provides, in pertinent part:

**(A) No person shall knowingly obtain, possess, or use a controlled substance.**

**(C) Whoever violates division (A) of this section is guilty of one of the following:**

**(4) If the drug involved in the violation is cocaine or a compound, mixture, preparation, or substance containing cocaine, whoever violates division (A) of this section is guilty of possession of cocaine. The penalty for the offense shall be determined as follows:**

**(a) Except as otherwise provided in division (C)(4)(b), (c), (d), (e), or (f) of this section, possession of cocaine is a felony of the fifth degree, and division (B) of section 2929.13 of the Revised Code applies in determining whether to impose a prison term on the offender.**

R.C. 2923.24(A) provides: "[n]o person shall possess or have under the person's control any substance, device, instrument, or article, with purpose to use it criminally."

{¶11} Counts one through three stemmed from a C.I.'s controlled purchase of crack cocaine from McGhee on March 2, 2005 and a subsequent search of the residence where the controlled purchase occurred. (Bill of Particulars, Doc. No. 16). At trial, C.I. Scott Moyers testified that he purchased forty dollars ($40)

worth of crack cocaine from McGhee, a.k.a. "C-Dog," in room five (5) of the Fostoria Motel. (Mar. 10-21, 2008 Tr. at 686-88, 690-91). Moyers identified State's exhibit 23 as a photograph of the Fostoria Motel where he purchased the crack cocaine from McGhee and State's exhibit 6 as the crack cocaine that he purchased from McGhee at that location. (Id. at 688); (State's Exs. 6, 9, 23). Detective Don Joseph testified that he maintained surveillance during the controlled drug purchase *at the Fostoria Motel*. (Mar. 10-21, 2008 Tr. at 1163-65). Two other law enforcement officers also testified that McGhee was in room five of the Fostoria Motel the day after the controlled buy when they executed the search warrant. (Id. at 1095-96, 1450, 1506, 1512). Accordingly, we are not persuaded that the State failed to produce evidence linking McGhee to the Fostoria Motel; and therefore, we cannot conclude that his conviction is against the manifest weight of the evidence for this purported reason.

{¶12} With regard to counts four and five, McGhee argues that: the State failed to present evidence that he resided at the home of James Stateler; a C.I. testified that he had no knowledge of where Ms. Engler obtained the drugs he purchased from her; and that Ms. Engler testified that McGhee had no knowledge that she intended to resell the drugs and testified that she did not conspire with him. We disagree.

**{¶13}** Counts four and five charged McGhee with complicity to trafficking in crack cocaine in violation of R.C. 2923.03(A)(2) and R.C. 2925.03(A)(1),(C)(4)(a) for knowingly aiding or abetting Luwana Engler and Robert E. Connor in selling crack cocaine. (Doc. No. 1). R.C. 2923.03(A)(2) provides: "[n]o person, acting with the kind of culpability required for the commission of an offense, shall * * * (1) [s]olicit or procure another to commit the offense[.]"

**{¶14}** At trial, Engler testified, in pertinent part:

**Q: Do you recall a specific occasion where you took a person you knew as Charlie over to the Stadium Drive residence?**
**\* \* \***
**A: Yes. \* \* \***
**Q: Do you remember what the -- whose residence that was?**
**A: It's Jamie Stateler's residence.**
**Q: And who lived with James Stateler at that time?**
**A: Uhm, Corey McGhee was staying upstairs.**
**Q: And where was he specifically staying?**
**A: Upstairs in the first bedroom to the left.**
**Q: Do you remember how that happened that you went over on that particular day, December 16, 2005.**
**A: Charlie showed up, wanted something and I called him and he told me to come on.**
**Q: When you say he wanted something, what do you mean?**
**A: He wanted some crack cocaine.**
**Q: Did he say how much crack cocaine he wanted?**
**A: I can't really recall right offhand right now, but usually Charlie wanted 50 or a 100 at a time.**
**Q: So what did you do when he told you that?**
**A: I called Corey.**
**\* \* \***
**Q: When you called that number on December 16, 2005, what did you say to the defendant?**

- 9 -

**A: I just told him I had somebody that wanted some stuff.**
**Q: And what was his response?**
**A: He said -- he said, "Well, come on through."**
**Q: Okay. What does that mean to you?**
**A: That means I know -- I knew where he was. He told me to come on, which meant just drive on over.**
**\* \* \***
**Q: And what happened when you arrived at the Stadium Drive residence?**
**\* \* \***
**A: Then I went up the stairs and went in and Corey gave me what I paid him for.**
**\* \* \***
**Q: What happened once you entered into this bedroom you referred to?**
**A: Uhm, I gave Corey the money and he gave me the dope and I said "Thank you" and left.**

(Mar. 17, 2009 Tr. at 913-18). According to Engler's testimony, McGhee was staying in one of Stateler's upstairs bedrooms, and thus, the State presented evidence that McGhee was living with Stateler.

{¶15} Although C.I. Charles Roberts—who purchased drugs from Engler on December 16, 2005—never saw the person who sold the drugs to Engler, he did testify that Engler took him to a location on Stadium Drive where she stated that she could purchase some crack cocaine for him. (Mar. 10-21, 2008 Tr. at 705-06, 710, 712-13, 794); (State's Ex. 54). Roberts further testified that: he gave Engler $100; Engler went into the residence on Stadium Drive, returned, and gave him crack cocaine. (Id. at 716-18). Roberts further testified that an individual named "C-Dog" lived at the Stadium Drive residence. (Id. at 721). According to

Engler, McGhee's nickname was "C-Dog." (Id. at 915). Engler did admit on cross-examination that McGhee did not have knowledge of her intent to sell the crack cocaine to Roberts and did not conspire with her to do so. (Id. at 965, 968). However, on direct examination, Engler testified that, when she called to get the drugs from McGhee, she "told him that [she] had somebody that wanted some stuff," and McGhee responded "[w]ell, come on through." (Id. at 915). Engler also testified that when she purchased the crack cocaine from McGhee, she "purchased two different purchases of crack cocaine: one for 50 and one for 40," because she wanted $40 dollars worth of crack for herself. (Id. at 918). Engler further testified about the people she brought to McGhee during 2005 and 2006 for drug purchases:

> **Q: How often would that happen back in 2004, 2005?**
> **A: Uhm, several times a week.**
> **Q: When you say several times?**
> **A: Three, four times a week, just depending on what I was doing and who showed up.**
> **Q: Every week?**
> **A: Hm-hmm.**
> **Q: During 2004 and five?**
> **A: I don't know about 2004, but 2005 that sounds about right.**
> **Q: Okay. How about 2006?**
> **A: 2006, I was even better.**
> **Q: When you say "even better" what --**
> **A: Even better. We had people that would come, like, seven days a week.**

(Id. at 923-24). With regard to January 4, 2006, Engler testified that she called C-Dog and "told him that I had somebody who wanted a bill's worth and he would

be back at such and such a time," and McGhee told her that he would have the drugs ready. (Id. at 926-27). Engler also testified concerning the criminal enterprise between her and McGhee as follows:

> **Q: * * * As part of the -- your case, Ms. Engler, were you convicted of four counts of Trafficking in Cocaine?**
> **A: That would be correct.**
> **Q: And you were also convicted of Engaging in a Pattern of Corrupt Activity, correct?**
> **A: That's correct.**
> **Q: Okay. With Robert Connor, Darrion Stewart, Alexa Johnson, James Burris, and Corey McGhee as associates as part of an enterprise, correct?**
> **A: That's correct.**
> **\* \* \***
> **Q: Did you have occasion to have personal knowledge that Corey McGhee had contact and distributed drugs to other persons in the City of Fostoria?**
> **A: Yes, he would have them come to my house.**
> **Q: Could you explain what you --**
> **A: Yes. He was at my house, you know, stopping by to see if we needed anything or just stopping by to chill. When a call came in, he would tell them where he was at, come on, which I dutifully charged him for.**
> **\* \* \***
> **Q: And he would sell crack cocaine in your presence to these persons?**
> **A: Yes.**
> **\* \* \***
> **Q: You mentioned that you would charge Mr. McGhee --**
> **\* \* \***
> **A: \* \* \* I would tell him -- remind him to tell them that they had to give up some for the house after they bought, because, you know, they're making my house hot. You couldn't just have them come in there like that, taking their stuff and leaving.**
> **Q: What would you charge him, cash or drugs?**
> **A: No. He would have them break off some of their -- what they just bought. And if they only bought like 20 then he would**

**throw, because if they had to take two hits out of a 20, they were pretty much screwed. They might as well just not came and bought.**
**Q: How much would that be, $20 each time a transaction occurred?**
**A: No. They only have to have a hit for the house and a hit for the hookup.**
**\* \* \***
**Q: And what's that mean, "a hit for the house"?**
**A: That means they have to break off a hit for one of us in the house, and then they have to break off a hit for the hookup.**
**Q: And would that be a piece of crack cocaine?**
**A: Yes.**
**Q: What would happen to that piece of crack cocaine--**
**A: \* \* \* We probably smoked it.**
**Q: How about the piece for the hookup?**
**A: See, one of us would take one and one would take the other. We shared.**
**Q: When you say "one of us" who are you referring to?**
**A: My fiancé.**

(Id. at 937-40).

{¶16} Robert Conner, likewise, testified about taking the C.I. to purchase crack cocaine at the Stadium Drive residence in December 2005. (Id. at 857); (State's Ex. 54). Conner testified as follows:

**Q: Do you remember one occasion, Mr. Connor, back on December 16, 2005, excuse me, December of 2005 of going to a 431 Stadium Drive residence?**
**A: Yes.**
**Q: Would you tell us how that came about?**
**A: Uhm, a colored guy named Charlie came to the house looking to buy -- he was a regular that like to come by and hang out at the house and smoke with us.**
**Q: What was he looking to buy on December 20, 2005, do you remember?**
**A: Uhm, I think it was like $90 worth, just crack cocaine.**

- 13 -

**Q: And okay. And where were you when this --**
**A: At the house.**
**Q: Which one?**
**A: South Main Street.**
**Q: And what happened?**
**A: Well, uhm, he promised that we -- he was gonna give us a little bit if we hooked him up. I was like, okay. So we headed down to the Stadium Drive. I went in, bought it, brought it back out to him and that was the deal.**
**Q: So that was an occasion where you were with Charlie yourself?**
**A: Yeah, I believe so. I remember it two times I was with him, one I rode with him and one I went in and got the stuff.**
**Q: Who went in and got the stuff the other time?**
**A: I think Luwana did.**
**\* \* \***
**Q: What did you do when you went back out to see Charlie?**
**A: He kind of argued with me and tried to say that this ain't what I wanted, this should have been more than that. I says, well, this is what he gave me. He took it and I got in, and he was suppose to give me some and he didn't because he said he thought I shorted him blah, blah. And then he dropped me off back at the house.**

(Id. at 856-60).

{¶17} After reviewing the testimony, we cannot conclude that the State failed to present evidence on the issues cited by McGhee. The evidence, viewed as a whole, demonstrates that McGhee knowingly aided or abetted both Engler and Conner in selling crack cocaine to the C.I. Therefore, we are not persuaded that McGhee's convictions on counts four and five were against the manifest weight of the evidence.

- 14 -

{¶18} With regard to counts eight through ten, McGhee argues that the State failed to present evidence that: he resided at Kim Martin's home, where the events took place; the contraband was found in his vicinity; and that finger print evidence tied him to the contraband. Counts eight through ten stemmed from McGhee's knowingly aiding or abetting Engler in selling crack cocaine on or about January 4, 2006. (Doc. No. 1). Count eight charged McGhee with complicity to trafficking in crack cocaine; count nine charged McGhee with possession of crack cocaine; and count ten charged McGhee with possessing criminal tools, to wit: a cell phone. (Id.).

{¶19} Possession is defined as "having control over a thing or substance, but may not be inferred solely from mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is found." R.C. 2925.01(K). However, "[p]ossession of drugs can be either actual or constructive. *State v. Pope*, 3d Dist. No. 9-06-61, 2007-Ohio-5485, ¶19, citing *State v. Cooper*, 3d Dist. No. 9-06-49, 2007-Ohio-4937, ¶25; *State v. Edwards*, 5th Dist. No. 2004-CA-00060, 2004-Ohio-6139, ¶10. An individual has constructive possession "if he is able to exercise domination and control over an item, *even if the individual does not have immediate physical possession of it.*" *Pope*, 2007-Ohio-5485, at ¶19, citing *Cooper*, 2007-Ohio-4937, at ¶25 (emphasis added); *Edwards*, 2004-Ohio-6139, at ¶10. "All that is required for constructive

possession is *some measure* of dominion or control over the drugs in question, beyond mere access to them." *State v. Norman*, 10th Dist. No. 03AP-298, 2003-Ohio-7038, ¶31, citations omitted (emphasis added). "[D]ominion and control may be proven by circumstantial evidence alone. *State v. Stewart*, 3d Dist. No. 13-08-8, 2009-Ohio-3411, ¶51, citing *State v. Trembly* (2000), 137 Ohio App.3d 134, 141, 738 N.E.2d 93.

**{¶20}** Engler testified regarding the January 4, 2006 controlled drug purchase as follows:

> **Q: Approximately two weeks after you sent Bob out to see Corey McGhee when he was at James Stateler's residence, did you have occasion to meet with Charlie again and Charlie wanted to get some more crack cocaine?**
> **A: Are you referring to January?**
> **Q: Yeah, January 4, 2006?**
> **A: Yes. He came and had me call ahead of time. He said he was dropping off his female that was with him -- I think he said it was his girlfriend or his wife -- had to drop her off at her sister's for a card game, and that he would be back. But he wanted the stuff ready. So I called ahead.**
> **Q: So who did you call ahead to?**
> **A: I called C-dog.**
> **\* \* \***
> **Q: And what did you tell him?**
> **A: I told him I had somebody who wanted a bill's worth and he would be back at such and such a time. Please have it, you know -- could he do it, have it ready.**
> **Q: And what was his response?**
> **A: And he said he would have it ready.**
> **Q: And, again, what were you expecting out of this for arranging this transaction?**
> **A: Uhm, I would have gotten a free 20 right off the top and then Charlie has to pay me, too.**

**Q: When you say a "free 20" is that a 20-piece of something?**
**A: Yes.**
**Q: Of what?**
**A: It's a 20-piece of crack cocaine.**
**Q: What happened after you had this conversation with the defendant on the phone?**
**A: Uhm, we hung up. When Charlie left he was a little late getting back, and he was really wired. And he did not have all his cash.**
**Q: So what happened next?**
**A: I had to fill in the gap for him, which really made me mad.**
**Q: So where did you go on this occasion?**
**A: We went to Maple Street.**
**Q: And who lived at Maple Street?**
**A: Kim Martin.**
**\* \* \***
**Q: And how was it that you were gonna go over to that location?**
**A: Because I knew that's where he'd went because Kim had been letting him use the car.**
**Q: Who is he that you're referring to?**
**A: C-Dog.**
**Q: The defendant in this case?**
**A: Yes.**
**Q: And how did you get over to that residence?**
**A: Charlie drove after he wanted to make 20 million pit stops.**
**Q: What happened when you arrived there?**
**A: Uhm, C-Dog was acting a little paranoid. They didn't want to answer the door, then finally answered the door and he didn't have nothing cooked, so it was not good.**
**\* \* \***
**Q: So what did you do?**
**A: I hollered at him and waved the money at him. He took his sweet time, but that's beside the point.**
**\* \* \***
**Q: Okay. And where was he cooking it at?**
**A: He had to go back out to the kitchen to use the microwave.**
**\* \***
**Q: Who was doing that?**
**A: C-Dog.**
**Q: The defendant?**

**A: Hm-hmm.**
**Q: And you saw him doing it?**
**A: I saw him start it. I saw him finish it. In between, I had to go to the door and tell Charlie to go back to the car, quit knocking on the door.**
**\* \* \***
**Q: How much, total, did you give the defendant?**
**A: A hundred dollars.**
**Q: What did you get in return for that $100?**
**A: My share, because 50 of it was mine that I paid for, the 20 off the top, plus I made him give me extra for having to wait.**

(Id. at 926-31). Engler also identified State's exhibit 94 as a photograph of Kim Martin's house where she took the C.I. to purchase crack cocaine from McGhee. (Id. at 932-33); (State's Ex. 94). Thus, contrary to McGhee's assertions, the State did present evidence that he was selling crack cocaine at Kim Martin's house.

{¶21} With regard to the contraband found at Martin's house, Detective Boyer testified that they executed a search warrant at 551 Maple Street *within hours* of the C.I.'s controlled purchase of crack cocaine at that residence. (Tr. at 106-07); (State's Ex. 94). When the warrant was executed, several people were located within the residence, including: McGhee, Ryan Johnson, John White, and Kim Martin. (Id. at 108). Two others, Nina Charleton and Rachelle Johnson, had just left the house and were entering their cars when police approached the house. (Id.). Boyer testified that: Ryan Johnson was found in the basement; John White was in the living room; Kim Martin was in his upstairs bedroom; and the residence was owned by Kim Martin. (Id. at 108-09). Boyer then identified several items or

- 18 -

photographs of items seized during the search, including: a small sealed plastic baggie of white powder that was found on the front living room floor (State's Ex. 78); a sealed plastic bag containing $4 that was found on the living room floor (State's Ex. 79); a large sandwich bag of rock-like substance found on the living room floor (State's Ex. 80); small baggies of rock-like substance found on John White (State's Ex. 81); sandwich baggies containing white residue found on McGhee (State's Ex. 82); a large bag of white powder of suspected cocaine found on the couch in the dining room or living room area of the first floor (State's Ex. 83); a plastic bag containing $1,541 found lying on the same couch (State's Ex. 84); a Nokia cell phone, phone number 419-619-3540, found on the same couch (State's Ex. 85); a suspected crack pipe found on the same couch (State's Ex. 86); a cell phone, phone number 419-464-5667, found on a living room chair (State's Ex. 88); a Bearcat scanner found in the living room next to the T.V. (State's Ex. 89); and a small sealed bag containing chore boy found on the floor next to the recliner in the living room (State's Ex. 90). (Id. at 109-12).

{¶22} Boyer further testified that State's exhibit 85—the cell phone, phone number 419-619-3540—was found lying on the couch right next to the U.S. currency and the powder cocaine. (Id. at 112). Boyer confirmed that Engler used this same phone number to purchase drugs from McGhee just hours before the search warrant was executed. (Id. at 113). Boyer also testified that, when law

enforcement entered the residence, McGhee was only wearing one "Dickies boot" on his left foot and nothing on his right foot. (Id. at 116, 122); (State's Exs. 95-97). Boyer further testified that a boot matching that worn by McGhee was found "in front of the location where the couch had the cocaine, cell phone, crack pipe, and lighter, and currency." (Id. at 123); (State's Exs. 98-100, 107-08). Additionally, Boyer testified that law enforcement identified the marked funds they had issued to C.I. Roberts to make the controlled purchase within the $1,541 found on the couch next to McGhee's cell phone and shoe. (Id. at 118); (State's Exs. 84, 93).

{¶23} In addition to this evidence, Nina Charleton testified that McGhee was sitting on the couch where cocaine, cell phone, and currency were found. (Tr. at 804-07). Charleton also testified that McGhee was in possession of a baggie of cocaine, a cell phone, and money earlier that evening. (Id. at 804-05). Lastly, Charleton testified that McGhee made two sales of crack cocaine at the residence in her presence, and, at one point, the cocaine was on the couch next to McGhee. (Id. at 803-04).

{¶24} With regard to the criminal tools conviction, Charleton testified that McGhee was receiving phone calls that evening, and Engler testified that she called McGhee's cell phone to purchase drugs. (Tr. at 803-07, 943).

{¶25} Viewing all of this evidence, we cannot conclude that the State failed to present evidence that McGhee had, at least, constructive possession of the drugs. The testimony established that the cocaine was found on the living room couch next to McGhee's cell phone, cash, and shoe. This was evidence of "*some measure* of dominion or control over the drugs in question" sufficient to find that McGhee had constructive possession. *Norman*, 2003-Ohio-7038, at ¶31, citations omitted. Aside from that, Charleton testified that McGhee had actual possession of the drugs earlier that day. (Id. at 804-05). That the State failed to present fingerprint evidence is of no consequence. Accordingly, we cannot conclude that the trial court's judgment of conviction on these counts was against the manifest weight of the evidence.

{¶26} Finally, with regard to counts eleven and twelve, McGhee argues that the State failed to present evidence of any "direct relationship" between the other co-defendants and him. We again disagree.

{¶27} Count eleven charged McGhee with participating in a criminal gang in violation of R.C. 2923.42(A),[2] which provided:

> **No person who actively participates in a criminal gang, with knowledge that the criminal gang engages in or has engaged in a pattern of criminal gang activity, shall purposely promote, further, or assist any criminal conduct, as defined in division (C) of section 2923.41 of the Revised Code, or shall purposely**

---

[2] This statute, along with R.C. 2923.41, was amended subsequent to McGhee's offenses and indictment. (H.B. 241, eff. 7-1-07).

**commit or engage in any act that constitutes criminal conduct, as defined in division (C) of section 2923.41 of the Revised Code.**

(H.B. 2, eff. 1-1-99); (Doc. No. 1). R.C. 2923.41 provided, in pertinent part, the following definitions for purposes of R.C. 2923.42:

**(A) "Criminal gang" means an ongoing formal or informal organization, association, or group of three or more persons to which all of the following apply:**
**(1) It has as one of its primary activities the commission of one or more of the offenses listed in division (B) of this section.**
**(2) It has a common name or one or more common, identifying signs, symbols, or colors.**
**(3) The persons in the organization, association, or group individually or collectively engage in or have engaged in a pattern of criminal gang activity.**

**(B)(1) "Pattern of criminal gang activity" means, subject to division (B)(2) of this section, that persons in the criminal gang have committed, attempted to commit, conspired to commit, been complicitors in the commission of, or solicited, coerced, or intimidated another to commit, attempt to commit, conspire to commit, or be in complicity in the commission of two or more of any of the following offenses:**

**(a) A felony or an act committed by a juvenile that would be a felony if committed by an adult;**
**(b) An offense of violence or an act committed by a juvenile that would be an offense of violence if committed by an adult;**
**(c) A violation of section 2907.04, 2909.06, 2911.211, 2917.04, 2919.23, or 2919.24 of the Revised Code, section 2921.04 or 2923.16 of the Revised Code, section 2925.03 of the Revised Code if the offense is trafficking in marijuana, or section 2927.12 of the Revised Code.**

**(2) There is a "pattern of criminal gang activity" if all of the following apply with respect to the offenses that are listed in division (B)(1)(a), (b), or (c) of this section and that persons in the criminal gang committed, attempted to commit, conspired to**

**commit, were in complicity in committing, or solicited, coerced, or intimidated another to commit, attempt to commit, conspire to commit, or be in complicity in committing:**
**(a) At least one of the two or more offenses is a felony.**
**(b) At least one of those two or more offenses occurs on or after the effective date of this section.**
**(c) The last of those two or more offenses occurs within five years after at least one of those offenses.**
**(d) The two or more offenses are committed on separate occasions or by two or more persons.**

**(C) "Criminal conduct" means the commission of, an attempt to commit, a conspiracy to commit, complicity in the commission of, or solicitation, coercion, or intimidation of another to commit, attempt to commit, conspire to commit, or be in complicity in the commission of an offense listed in division (B)(1)(a), (b), or (c) of this section or an act that is committed by a juvenile and that would be an offense, an attempt to commit an offense, a conspiracy to commit an offense, complicity in the commission of, or solicitation, coercion, or intimidation of another to commit, attempt to commit, conspire to commit, or be in complicity in the commission of an offense listed in division (B)(1)(a), (b), or (c) of this section if committed by an adult.**

(H.B. 2, eff. 1-1-99). Count twelve charged McGhee with engaging in a pattern of corrupt activity in violation of R.C. 2923.32(A)(1), which provides:

**(A)(1) No person employed by, or associated with, any enterprise shall conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity or the collection of an unlawful debt.**

(Doc. No. 1).

**{¶28}** McGhee was convicted in count eleven for his role in selling crack cocaine as a member of the "Gear Gang Crips" gang. Gregory Green testified that he was convicted of participating in a criminal gang and engaging in a pattern of

corrupt activity. (Tr. at 1313). Green testified that he knew McGhee as "C-Dog," and that he first met him in 2005 when he was released from jail. (Id. at 1314-15). Green testified that he knew McGhee because of their mutual affiliation with the Gear Gang Crips gang based out of the west side of Toledo, Ohio. (Id. at 1315). Green testified that McGhee was an "OG" ranked member of the Gear Gang Crips, and that "OG" meant he was one of the original gang members. (Id. at 1316). Green testified that he came from Toledo to sell crack cocaine, powder cocaine, and marijuana in Fostoria, Ohio, and that he had witnessed McGhee selling crack cocaine about ten times. (Id. at 1314, 1318-19). Green further testified that McGhee affiliated with the same persons for whom he was convicted on his RICO charge, including: James Burris, Shane McDuffey, and Darrion Stewart. (Id. at 1320, 1327). On cross-examination, Green admitted that he never saw McGhee initiated into the gang, but that he has "seen him around a lot with affiliated gang members. And you a - - a gang member not gonna go - - allowing you to hang around them if you're not in the gang * * *." (Id. at 1325).

{¶29} Leslee Delarosa testified that Aaron Hoskins, Marquette Dean, Darrion Stewart (a.k.a. "D-Train"), Christopher Kincade (a.k.a. "Trub"), Shane McDuffey, Derrick Noles, Gregory Green, Michael Thomas (a.k.a. "Mike-Mike"), William Lamar Jackson, Ronald Johnson (a.k.a. "Poochie"), Anthony Duffey (a.k.a. "Little Ant"), James Burris (a.k.a. "Dubb" or "Double Breasted"), were all

members of the Toledo-based Gear Gang Crips that brought drugs to Fostoria from Toledo to sell. (Id. at 1527-64). Likewise, Alexa Johnson testified that Stewart would go with Burris to Toledo to purchase crack cocaine to sell in Fostoria. (Tr. at 1631). Johnson testified that both Stewart and Burris provided McGhee with crack cocaine, and McGhee sold some pieces of this crack cocaine to other individuals. (Id. at 1628-31). Johnson also confirmed Delarosa's testimony that many of these individuals dealing crack cocaine were members of the Gear Gang Crips gang. (Id. at 1640, 1643, 1645, 1647, 1651-52, 1654, 1656-57, 1661). Johnson further testified that Stewart posted bond for McGhee when he was arrested. (Id. at 1659-60). In addition, McGhee's cell phone records indicated a strong affiliation with several other drug-dealing Gear Gang Crips members. (Tr. at 545-80). In fact, from December 6, 2005 to February 28, 2006, McGhee called: Stewart 272 times; Burris 104 times; McDuffey 86 times; White 10 times; Jackson 6 times; and Kincade 5 times. (Id. at 580-81); (State's Ex. 396). Furthermore, McGhee actually called Stewart while he was in the Seneca County Jail and, in March 2006, told law enforcement that he could assist them in their investigation of Burris and Stewart. (Id. at 539-40, 544-45, 402-06).

{¶30} Based upon our review of the evidence, we cannot conclude that McGhee's convictions on counts eleven and twelve were against the manifest weight of the evidence. The evidence, taken in its totality, demonstrates that

McGhee was a member of the Gear Gang Crips gang; the gang was involved in selling drugs; and McGhee was selling drugs, assisting the gang's criminal activity. The evidence also demonstrates a pattern of corrupt activity; to wit: the selling of illegal drugs, usually crack cocaine, in Fostoria, Ohio by several members of the gang and others not affiliated with the gang as well. For these reasons, we reject McGhee's argument that his convictions were against the manifest weight of the evidence. Furthermore, we cannot find that McGhee's convictions amount to plain error.

{¶31} McGhee's third assignment of error is, therefore, overruled.

### ASSIGNMENT OF ERROR NO. I

**APPELLANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO DUE PROCESS WHEN THE TRIAL COURT ADMITTED EVIDENCE OF MULTIPLE CO-DEFENDANT'S [SIC] GUILTY PLEAS AS SUBSTANTIVE EVIDENCE OF APPELLANTS [SIC] GUILT.**

{¶32} In his first assignment of error, McGhee argues that the trial court erred when it admitted his co-defendants' guilty pleas and sentencing entries. The State argues that these records were properly admitted for purposes of establishing a criminal gang, a pattern of corrupt activity, and pattern of criminal gang activity for counts eleven and twelve. Furthermore, the State argues that any potential error was harmless in light of the other probative evidence presented relative to these counts. We agree with the State that the trial court did not err.

{¶33} "[D]ecisions regarding the admissibility of evidence are within the sound discretion of the trial court and will not be reversed absent a showing of an abuse of discretion." *Stewart*, 2009-Ohio-3411, at ¶97, citations omitted. An abuse of discretion "connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable." *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 450 N.E.2d 1140.

{¶34} This Court recently rejected this same argument in *State v. Stewart*, which involved McGhee's co-defendant Darrion Stewart. 3d Dist. No. 13-08-18, 2009-Ohio-3411. This Court reasoned, in pertinent part, as follows:

> **In the present case, numerous indictments, pleas, and sentences were introduced at trial. However, we note that these documents were not introduced per se as substantive evidence of Stewart's guilt. Instead, these documents were introduced to show the behavior of co-defendants in proving an enterprise engaged in corrupt activity. For example, information concerning a co-defendant was not introduced to show that because a co-defendant sold drugs, Stewart must have as well. Instead, the information was introduced to show that Stewart sold drugs to a particular co-defendant, who then went and sold drugs to someone else, proving an enterprise engaging in a pattern of corrupt activity and also that Stewart was part of a criminal gang engaged in criminal conduct.**
>
> **We are also mindful that, when we are considering a charge of Engaging in a Pattern of Corrupt Activity, the State is required to prove that a person, associated with an enterprise, either directly or indirectly engaged in a pattern of corrupt activity. In the present case, the State did not only allege Stewart's direct participation in corrupt activity, but also alleged his indirect participation through the resale of the drugs he sold to other co-defendants.**

**The Ohio Supreme Court has held that,**

**Offenses under RICO, R.C. 2923.32, are *mala prohibita, i.e.,* the acts are made unlawful for the good of the public welfare regardless of the state of mind. Thus, we agree with the Twelfth District's reasoning in *State v. Haddix* (1994), 93 Ohio App.3d 470, 638 N.E.2d 1096, which stated, "Whether a defendant knowingly, recklessly or otherwise engages in a pattern of corrupt activity, the effect of his activities on the local and national economy is the same. Requiring the finding of a specific culpable mental state for a RICO violation obstructs the purpose of the statute * * *." *Id.* at 477, 638 N.E.2d at 1101. Given these goals, we believe that the General Assembly intended to enhance the government's ability to quell organized crime by imposing strict liability for such acts.**

***State v. Schlosser*, 79 Ohio St.3d 329, 333.**

**"To obtain convictions, [the state] had to prove that each defendant was voluntarily connected to that pattern and performed at least two acts in furtherance of it." *State v. Schlosser*, 79 Ohio St.3d at 334 citing *United States v. Palmeri* (C.A.3, 1980), 630 F.2d 192, 203. The RICO statute was designed to impose cumulative liability for the criminal enterprise. *State v. Schlosser*, 79 Ohio St.3d at 334.**

**Therefore, it was essential that the State prove Stewart associated with the enterprise. However, it was not essential that the State prove Stewart knew of every instance of corrupt activity stemming from his corrupt activity, i.e. that he knew of every drug sale that resulted from his drug sales. In the present case, the State alleged Stewart's indirect participation in corrupt activity through the "enterprise" of the Gear Gang Crips and others he was associated with through drug sales. Therefore, the convictions of those Stewart supplied with drugs, during the period testimony was given to establish that Stewart was these persons' main supplier of drugs was directly relevant to Stewart's indirect participation with the extended criminal enterprise that was involved in selling drugs in Fostoria.**

*Stewart*, 2009-Ohio-3411, at ¶¶105-108. Furthermore, we noted in *Stewart* that "the introduction of a judgment entry of conviction is the preferred method of proving a predicate offense related to a charge of Engaging in a Pattern of Corrupt Activity." Id. at ¶108, fn.7, citing *State v. Lightner*, 3d Dist. No. 6-08-15, 2009-Ohio-2307; *State v. Lightner*, 3d Dist No. 6-08-11, 2009-Ohio-544. Like in *Stewart*, we cannot conclude that the trial court abused its discretion by admitting the indictments of McGhee's co-defendants since the State admitted them to show that McGhee was affiliated with a gang and an illegal enterprise. Even if we were to assume that the trial court erred by admitting the indictments, we would find any error relating thereto harmless given the overwhelming evidence of McGhee's guilt. *State v. Brown*, 100 Ohio St.3d 51, 2003-Ohio-5059, 796 N.E.2d 506, ¶25, citing *State v. Getsy* (1998), 84 Ohio St.3d 180, 193, 702 N.E.2d 866.

## ASSIGNMENT OF ERROR NO. II

**THE TRIAL COURT PREJUDICIALLY ERRED WHEN IT ADMITTED PHONE RECORDS THAT WERE NOT PROPERLY AUTHENTICATED AND WERE THE CRUX OF THE PROSECUTIONS [SIC] CASE THEREFORE SUCH EVIDENCE CANNOT BE HARMLESS ERROR.**

{¶35} In his second assignment of error, McGhee argues that the trial court improperly admitted Verizon wireless' phone records without proper authentication. Specifically, McGhee argues that the State's witness: had never seen the records; had no personal knowledge that the records were from Verizon

wireless; and had no knowledge of where the records came from. McGhee also argues that Detective Boyer testified that the documents were records, not bills, and that nothing in records to indicate who they belonged to or who placed the phone calls.

**{¶36}** The State, however, argues that the Verizon wireless phone records were Evid.R. 803(6) business records that the trial court properly admitted based upon a Verizon wireless employee's authentication. The State argues that the Verizon wireless employee who testified for authentication purposes qualifies as an "other qualified witness" under Evid.R. 803(6). We agree.

**{¶37}** As previously noted, a trial court's decision to admit or exclude evidence at trial is reviewed under and abuse of discretion standard. *Stewart*, 2009-Ohio-3411, at ¶97, citations omitted. An abuse of discretion "connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable." *Blakemore*, 5 Ohio St.3d at 219.

**{¶38}** Evid.R. 803(6) provides the following hearsay exception:

> **(6) Records of regularly conducted activity. A memorandum, report, record, or data compilation, in any form, of acts, events, or conditions, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian *or other qualified witness* or as provided by Rule 901(B)(10), unless the source of information or the method or circumstances of preparation indicate lack of**

> **trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.**

(Emphasis added). This Court has previously found that the phrase "other qualified witness" should be broadly interpreted. *State v. Shaheen* (July 29, 1997), 3d Dist. No. 5-97-03, at *2, citing *State v. Patton* (Mar. 5, 1992), 3d Dist. No. 1-91-12; *State v. Vrona* (1988), 47 Ohio App.3d 145, 148, 547 N.E.2d 1189. In fact,

> **[t]he witness providing the foundation need not have firsthand knowledge of the transaction. Rather, it must be demonstrated that the witness is sufficiently familiar with the operation of the business and with the circumstances of the record's preparation, maintenance and retrieval, that he can reasonably testify on the basis of this knowledge that the record is what it purports to be, and that it was made in the ordinary course of business consistent with the elements of Rule 803(6).**

*Vrona*, 47 Ohio App.3d at 148, citing 1 Weissenberger's Ohio Evidence (1985) 76, Section 803.79; *Shaheen*, 3d Dist. No. 5-97-03, at *2; *Patton*, 3d Dist. No. 1-91-12.

{¶39} Here, Cynthia Hass testified that she has served as an assistant manager at the Verizon wireless store located in Fremont, Ohio for the past year. (Tr. at 23). For seven years prior to becoming an assistant manager, Hass was a Verizon wireless sales representative. (Id. at 23-24). Hass estimated that ninety percent of her duties as assistant manager consisted of handling customer complaints and scheduling, and that these duties required her to use Verizon wireless records. (Id. at 24). Hass testified that she was familiar with Verizon

wireless billing records since she had to access those records hourly when handling customers' billing questions or concerns. (Id. at 24-25). Hass also testified that she can retrieve these records from a computer database. (Id. at 25). Hass then identified: State's exhibit 345 as a phone bill for phone number 419-619-3540 for the month of October 2005 and a phone bill for phone number 419-619-3378 for the month of February 2006; and State's exhibit 346 as a phone bill for phone number 419-619-1974 for the month of October 2005 through January 2006. (Id. at 26-27). Hass testified that these records were kept on the computer database as part of the business, and other than being Verizon's record-keeper, she had no other involvement with the case. (Id. at 29-30). On cross-examination, Hass testified that the records "* * * look like normal bills, so I am sure it came from the Verizon database * * *" and that she knew that the documents were Verizon wireless phone bills. (Id. at 31-32).

{¶40} Based upon this evidence, we conclude that the Verizon phone records were properly authenticated. Hass testified that she was familiar with Verizon's phone bills from her experience as an assistant manager handling customers' billing questions and complaints. Hass further testified that, although she did not have personal knowledge of the records' creation, the records were retrieved from Verizon's computer database. Hass also testified that these records were maintained on Verizon's computer database in the ordinary course of its

business. Under these circumstances, Hass was "sufficiently familiar" with Verizon wireless' business operations—specifically its billing records—to "reasonably testify" that these records were what they purported to be and were made in the ordinary course of the business. *Vrona*, 47 Ohio App.3d at 148, citing 1 Weissenberger's Ohio Evidence (1985) 76, Section 803.79; *Shaheen*, 3d Dist. No. 5-97-03, at *2; *Patton*, 3d Dist. No. 1-91-12. Therefore, the trial court did not abuse its discretion by admitting the Verizon wireless phone records.

{¶41} McGhee's second assignment of error is, therefore, overruled.

{¶42} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**WILLAMOWSKI and SHAW, J.J., concur.**

**/jlr**