[Cite as *State v. Pollard*, 2011-Ohio-1437.]

IN THE COURT OF APPEALS FOR CLARK COUNTY, OHIO

STATE OF OHIO                                    :

    Plaintiff-Appellee                       :       C.A. CASE NO. 2010 CA 29

v.                                               :       T.C. NO.   09CR569

RICKEY POLLARD                                   :       (Criminal appeal from
                                             Common Pleas Court)
    Defendant-Appellant                      :

                                           :

. . . . . . . . . .

**O P I N I O N**

Rendered on the ___25th___ day of ____March____, 2011.

. . . . . . . . . .

LISA M. FANNIN, Atty. Reg. No. 0082337, Assistant Prosecuting Attorney, 50 E. Columbia Street, 4th Floor, P. O. Box 1608, Springfield, Ohio 45501
    Attorney for Plaintiff-Appellee

LUCAS W. WILDER, Atty. Reg. No. 0074057, 120 W. Second Street, Suite 400, Dayton, Ohio 45402
    Attorney for Defendant-Appellant

. . . . . . . . . .

BROGAN, J. (by assignment)

{¶ 1} Rickey Pollard appeals from his conviction of complicity to a breaking and entering in violation of R.C. 2923.03(A)(2).

{¶ 2} In the early morning hours of June 1, 2009, Gloria Morgan observed suspicious activity outside the Sidetrax Tavern in Springfield, Ohio. Morgan lived a short

distance from the bar and she made these observations while standing on her porch at five o'clock in the morning. She testified as follows:

**{¶ 3}** "And so I was smoking, and I seen this one guy come at Sidetrax Tavern and I seen him looking all down on the ground; and then he goes back around to the door and then another guy comes around and does the same thing and then he goes back to the door and then the other guy comes back and goes over to the dumpster; and I think, well, I don't know, maybe they're just there for the cans. I mean because so many guys come there for cans, you know; and I thought well, all right.

**{¶ 4}** "And they kept - and then the one guy, he looks at - down on the ground at the side of the Sidetrax and then goes to the dumpster and then he comes back throwing his hands all in the air, the one guy did, like he just didn't know." Tr., pp. 110-111.

**{¶ 5}** Ms. Morgan contemplated calling the police, but decided not to do so because she did not "want to be wrong." Tr., p. 111. She identified one man as "wearing a white shirt and blue pants and he had a regular haircut." Tr., p. 111. The "other guy was wearing a blue shirt and blue jeans, and he had a cast on his leg and orange kinky hair." Id. Neither man she observed had a hat or jacket on. Tr., p. 126.

**{¶ 6}** After seeing this "suspicious" activity, Ms. Morgan returned to bed only to be awoken by the bar's alarm system an hour later at 6:00 a.m. Tr., p. 112. She returned to her porch to see the guy without the brace walking away from the bar with a "great big white container." Tr., pp. 112-113, 129. According to Ms. Morgan the man with the white container and the man with the leg brace "were separate the whole time." Tr., p. 113. The two men "did not leave together." Tr., p. 114. They were "never both together." Tr., p.

128. There was no exchange between the men. Id.

{¶ 7} According to Ms. Morgan, the man with the container then walked by the paper delivery man (Fred Mays) and began to discuss something. Tr., pp. 129-130. There were two men talking to the paper delivery man, and Ms. Morgan testified she "would imagine" it was the two men she observed outside the bar. Tr. 130. She never saw a heavy-built male. Tr., p. 131.

{¶ 8} Ms. Morgan observed Pollard in the courtroom and testified that the man she saw had a regular hair cut, not long hair as Pollard. Tr., pp. 115-116. She also observed a photo taken of Pollard shortly after the bar was broken into. Tr., pp. 117-118. She testified that the cast worn by the man on the morning the bar was broken into was different than the one Pollard wore in the picture. Tr., pp. 117-118, 133. On cross-examination, Ms. Morgan testified that the style, color and type of hair in Pollard's picture did not match the man's hair she saw that morning. Tr., p. 123. She also admitted that she never told the police that one of the men she saw that morning had a cast on. Tr., p. 124.

{¶ 9} Fred Mays testified that while delivering papers at 6:00 a.m. that morning he noticed "a couple of guys carrying a white bucket full of bottles." Tr., p. 139. He opined that his first impression was the men had gotten the bottles out of the dumpster next to the bar. Id. He "stood there for a second staring at it and drove on." Id. Mr. Mays then went to Ms. Morgan's house to deliver the paper and was told by her that two men had just broken into the bar. Tr., pp. 139-140. Mr. Mays described the two men as follows: one "was kind of stocky white male, tall and the other one was kind a skinny, carrying a bucket of liquor; and the one was hollering 'Come on let's go.' " Tr., p. 140. One man was "wearing a black

jacket" and a "baseball cap"; the other was wearing a "hoodie." Tr., p. 140. One of the men was heavy-set. Tr., p. 140.

{¶ 10} Mr. Mays did observe a third man "further up the street" with a leg brace on. Tr., pp. 140-141. The man with the leg brace walked passed Mr. Mays and was "behind" him when he noticed the two guys with the white container full of bottles. Tr., pp. 148-149. Mr. Mays identified Pollard as the man he saw "further up the street." Tr., p. 141. Pollard was not one of the men carrying the container. Tr., pp. 146-147. Mr. Mays admitted he "really wasn't paying any attention to 'em 'cause I was in a hurry trying to get done and go home." Tr., p. 149. Based upon his limited observation, Mr. Mays opined that the men did not appear to be together. Tr., p. 150.

{¶ 11} The owner of the tavern, Melanie Meade, testified that she was called by the police and notified of the breaking and entering of her bar. She testified that someone had tried to kick the door to her tavern in, but was unsuccessful. Someone had thrown a concrete brick through the window of the bar and entered the bar. Whoever entered knew the password for the security alarm and managed to turn it off. She discovered that the thief or thieves had stolen several half-gallons of liquor and money from the jukebox and video game. She testified that one of the persons involved in the breaking and entering was "serving time" for it and his brother's girlfriend tended bar for her and had the pass-code. (T. 91). Meade said there was a white trash can missing out of the bar's men's room. Meade testified that she had seen Pollard in her bar on a previous occasion wearing a leg brace similar to the one described by the police in their investigation. (T. 93). On cross-examination, Meade stated a man in prison for the breaking and entering was Johnnie

Wade, Jr., a tall, skinny young man in his twenties. (T. 101).

{¶ 12} Angela Rogan testified she was "drinking buddies" with Pollard. (T. 153). She testified that Pollard told her he was there when the Sidetrax was "robbed" but that he didn't do it, his nephew and cousin did. (Tr. 154). On cross-examination, Rogan testified that Pollard told her that he heard that Johnny Wade had done the break-in. (T. 158).

{¶ 13} Officer Rex Ashworth of the Springfield Police Department testified he went to the Sidetrax Tavern to follow up on the investigation. Ashworth testified Pollard was present at the bar and Ms. Morgan was also present. Ashworth testified Morgan told him that Pollard was the same build and wore the same clothing and leg brace she saw on one of the suspects but she didn't get a close enough look to identify him. Ashworth testified he interviewed Fred Mays who gave him a description of what he saw the morning of the crime. Mays told Ashworth he saw the man with the leg brace carry the white container with the liquor bottles behind the tavern across the railroad tracks where a third heavy-set male was waiting. Ashworth testified he showed a photo lineup to Mays who identified Pollard as one of the persons he saw at the crime scene. Ashworth interviewed Pollard who stated he was home at the time the break-in of the tavern occurred.

{¶ 14} Pollard testified that he did not help Wade and Hanke break into the Sidetrax Tavern. He said he was home that morning in bed sick and his friends could vouch for him. He said he heard his wife's nephew, Johnnie Wade, committed the break-in. He denied knowing Donald Hanke. On cross-examination, Pollard admitted he had been convicted of aggravated burglary in 1989.

{¶ 15} Donald Hill, David Bass, and Joseph Tussing all testified they lived with

Pollard. They testified that Pollard went to bed at 10:30 the night before the break-in and they saw him come downstairs the next morning at 10:30 in the morning. None could say whether Pollard left the house early on the morning of the break-in.

{¶ 16} In his first assignment of error, Pollard contends the trial court erred when it instructed the jury improperly concerning the culpability state necessary for complicity to commit breaking and entering. Pollard argues that in order to convict him of the complicity charge, the State was required to prove that he acted with the culpability required for the commission of the underlying offense of breaking and entering. The State concedes the court was required to instruct the jury that Pollard "purposely" aided and abetted another to trespass into an unoccupied structure by force or stealth with the purpose to commit thereon the offense of theft. Initially, the court improperly instructed the jury that the defendant need only knowingly aid and abet another in the commission of the breaking and entering. (T., pp. 280-281). No objection was made by counsel to the erroneous charge. The court later corrected the erroneous charge by stating,

{¶ 17} "This is a complicity charge. You've been instructed that that means aiding and abetting - that the allegation - another in the commission of the breaking and entering. You can read into that instruction then that there was present in the mind of the defendant a specific intention to aid and abet another in the commission of a theft." (T. at 291).

{¶ 18} The court had earlier instructed the jury that a person acts purposely when it is his specific intention to cause a certain result. (T. 282).

{¶ 19} The failure to object to a jury instruction constitutes a waiver of any claim of error relative thereto, unless, but for the error, the outcome of the trial clearly would have

been otherwise. *State v. Underwood* (1983), 3 Ohio St.3d 12. The plain error rule should be applied with utmost caution and should be invoked only to prevent a clear miscarriage of justice. *State v. Long* (1978), 53 Ohio St.2d 91. The court's erroneous instruction was immediately corrected. Also, the defense raised by the defendant was not related to his culpability state; it was an alibi defense. Pollard claimed he wasn't there and the witnesses misidentified him. We cannot say the outcome of the trial would have clearly been different had the trial court not initially mispoke concerning the proper culpability state required of an accomplice. The first assignment is overruled.

{¶ 20} In his second assignment, Pollard argues that the trial court erred in allowing the prosecutor and two witnesses to comment that his accomplices had already pled guilty or were in prison for their involvement in the break-in. The State argues that these pleas were mentioned in the prosecutor's opening statement and were not evidence and the jury was so instructed.

{¶ 21} During the prosecutor's opening statement the prosecutor stated in part the following:

{¶ 22} "When the Defendant was arrested, in questioning he said that Johnny Wade, Jr. was the one that broke in. Interesting that he would know that.

{¶ 23} "Also another person who pled guilty on this break-in was Donald Hanke who is a heavy built white male, 6 foot three, 335 pounds." (T., p. 19).

{¶ 24} No objection was made by Pollard's counsel to the prosecutor's statements. During the trial, Melanie Meade testified that one of the persons involved was "now serving time" for "this robbery." (T., p. 91). She identified that person as Johnnie Wade, Jr. (T.,

p. 101). Later, Officer Ashworth testified that Johnnie Wade, Jr. and Donald Hanke admitted their involvement in the break-in. (T., p. 173). Testimony from Fred Mays established there were three men new to the bar when he made his observation. In closing argument, the prosecutor stated the defendant's nephew, Johnnie Wade, Jr., had already been connected for his part in the break-in. (T. 251). No objection was ever made to any of this testimony nor to the prosecutor's remarks in opening and closing argument.

{¶ 25} Pollard notes that evidence that a co-defendant has pleaded guilty or has been convicted of an offense stemming from the same facts forming the basis of the prosecution against another is inadmissible as proof against the other. *State v. Stewart*, Seneca App. No. 13-08–18, 2009-Ohio-3411.

{¶ 26} The State argues that the guilty pleas were introduced for the purpose of identifying the principal offenders and to show that the defendant did not have the same build as Wade and Hanke which was later confirmed by eye witnesses. Testimony was introduced that Wade was tall and thin, Hanke was tall and heavy set, and Pollard was relatively short and of medium build. The State notes that this testimony was not improperly emphasized or used as substantive evidence of Pollard's guilt.

{¶ 27} In *United States v. King* (C.A.5, 1974), 505 F.2d 602, 607, the court made the following assessment of reviewing cases like this where a defendant failed to object to a mention that a co-defendant had pleaded guilty prior to trial:

{¶ 28} "In assessing King's assertion of plain error in this case, then, we must carefully examine all the facts and circumstances of the case in their proper ** context. The presence or absence of an instruction is an important factor, but it is also essential to

consider other factors, such as whether there was a proper purpose in introducing the fact of the guilty plea, whether the plea was improperly emphasized or used as substantive evidence of guilt, whether the introduction of the plea was invited by defense counsel, whether an objection was entered or an instruction requested, whether the defendant's failure to object to the testimony could have been the result of tactical considerations, and whether, in light of all the evidence, the failure to give an instruction was harmless beyond a reasonable doubt."

{¶ 29} It was proper for the State to introduce evidence of the physical characteristics of Pollard's accomplices. The prosecutor did not improperly emphasize the fact that Wade and Hanke pled guilty to the breaking and entering nor did he argue that since Wade and Hanke admitted their guilt, Pollard must also be guilty. No objection to this testimony or the lack of a limiting instruction was made by Pollard's counsel. There was testimony by Angela Rogan that Pollard told her that he heard that his nephew did the break-in.

{¶ 30} In his third assignment, Pollard contends the trial court erred in allowing Officer Ashworth to give hearsay testimony from the State's witnesses concerning the identification of Pollard. Pollard contends these hearsay statements were more descriptive of him than provided by the witnesses at trial.

{¶ 31} Ashworth testified he arrested Pollard at the Sidetrax Tavern four days after the break-in. Ashworth testified that Pollard was "wearing basically the same clothing, and had the same leg brace on. . ." he had on when he was seen four days earlier. Ashworth also testified that Fred Mays told him the man with the leg brace carried the white container. Tr., pp. 169, 176-177. Ashworth said Mays told him that one man "readily stuck out in his

mind because he had a leg brace on." Id.

{¶ 32} The State argues that Ashworth's testimony was not hearsay because it was offered by him to explain his conduct while investigating the break-in. The State argues that Ashworth's testimony concerning Ms. Morgan's statements to him was to explain why Pollard was taken by him to police headquarters. The State argues that Ashworth's testimony concerning Mays was to explain why he asked Mays to examine a photo-lineup.

{¶ 33} Evid.R. 801(C) provides that hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Where statements are offered to explain an officer's conduct while investigating a crime, such statements are not hearsay. *State v. Thomas* (1980), 61 Ohio St.2d 223; *State v. Blevins* (1987), 36 Ohio App.3d 147.

{¶ 34} In *Blevins*, the Franklin County Court of Appeals cited *Thomas* for the admissibility of such statements but Judge Strausbaugh continued:

{¶ 35} "As Dean McCormick notes, however, the potential for abuse in admitting such statements is great where the purpose is merely to explain an officer's conduct during the course of an investigation. *McCormick*, supra, Section 249, at 734. Our review of the relevant Ohio case law finds no specific standards for the admission of such statements. Accordingly, certain conditions should be met before the court admits statements which explain an officer's conduct during the course of a criminal investigation.

{¶ 36} "The conduct to be explained should be relevant, equivocal and contemporaneous with the statements. 6 Wigmore, Evidence (Chadbourn Rev. Ed. 1976) 267, 268, Section 1772. Additionally, such statements must meet the standard of Evid.R.

403(A)."

**{¶ 37}** Judge Strausbaugh in a footnote opined that the defense counsel's better objection would have been on grounds of Evid.R. 402 or 403(B), since foundation can be established by merely stating, "I came to know defendant through my conversations with X."

**{¶ 38}** It is important to note that unlike *Blevins*, defense counsel made no objection to Officer Ashworth's alleged hearsay testimony. Evid.R. 103(A)(1) provides that error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and in case the ruling is one admitting evidence, a timely objection or motion to strike appears of record stating the specific ground of objection. Crim.R. 52(B) provides that plain error or defects affecting rights may be noticed although they were not brought to the attention of the court. Plain error does not exist unless it can be said that but for the error, the outcome of the trial clearly would have been otherwise. *State v. Long* (1978), 53 Ohio St.2d 91, para. two of the syllabus.

**{¶ 39}** Ashworth could have simply testified that after talking with Morgan and Mays he arrested Pollard. The admission of this testimony was objectionable, but we cannot say Pollard would probably have been acquitted without it. Defense counsel may not have objected to Ashworth's testimony concerning Fred Mays because Mays' statements to him contradicted his trial testimony. Defense counsel noted Mays' contradictory statement in his final argument. (T. 267). The appellant's third assignment of error is overruled.

**{¶ 40}** In his fourth assignment, Pollard contends his conviction was against the manifest weight of the evidence and was based on insufficient evidence. Pollard argues that

viewing the evidence in its best light, the most it proved was he was in the area of the tavern when the break-in occurred.

{¶ 41} Ms. Morgan testified that Pollard matched the general description of the man with the leg brace she saw walking back and forth outside the Sidetrax at five o'clock in the morning. When Pollard was arrested at the Sidetrax four days later, Ms. Morgan told police Pollard was wearing the same clothing and leg brace as the morning of the break-in except for a black jacket and black hat. (T. 132).

{¶ 42} Fred Mays testified he approached the tavern just after the break-in and observed two individuals carrying a white trash can with bottles inside. He also saw a person nearby whom he identified as his neighbor, Pollard. He noted that Pollard was wearing a leg brace.

{¶ 43} "'[S]ufficiency is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law.'" *State v. Thompkins*, 78 Ohio St.3d 380, 386, 1997-Ohio-52, quoting Black's Law Dictionary (6th Ed. 1990) 1433. "Whether the evidence is legally sufficient to sustain a verdict is a question of law." Id. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."*State v. Jenks* (1991), 61 Ohio St.3d 259, paragraph two of the syllabus.

{¶ 44} Reviewing the evidence in a light most favorable to the prosecutor, the jury could reasonably conclude that Pollard was present the morning of the break-in and was acting as a "look-out" for Johnnie Wade, Jr., his nephew, and Donald Hanke who entered the

bar that morning.

**{¶ 45}** A weight of the evidence argument challenges the believability of the evidence; which of the competing inferences suggested by the evidence is more believable or persuasive. The proper test to apply to that inquiry is the one set forth in *State v. Martin* (1983), 20 Ohio App.3d 172, 175:

**{¶ 46}** "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."

**{¶ 47}** While this issue is a closer question, we do not believe the jury lost its way in finding appellant guilty of complicity to the break-in of the tavern. Ms. Morgan testified a man matching Pollard's description "with a leg brace" was walking up and down outside the tavern consistent with "casing" the tavern before attempting to enter it. Mays knew Pollard and said he saw him nearby two other men at the time of the crime. Pollard testified he was not present that morning, but was home in bed sick. No evidence was presented that suggested Mays was not a credible witness. Pollard's nephew, Johnnie Wade's wife, was a bartender at the Sidetrax and had access to the pass-code. Ms. Morgan testified the alarm rang only briefly consistent with the pass-code being entered to shut off the alarm by someone familiar with it. Pollard's alibi witnesses could only testify that they saw him go to bed at ten o'clock the previous night and was not seen until 10:30 the next morning. Pollard lived only two blocks from the tavern. The appellant's conviction is not against the manifest weight of the evidence either.

{¶ 48} The judgment of the trial court is affirmed.

. . . . . . . . . .

HALL, J., concurs.

FROELICH, J., concurring:

{¶ 49} The trial court initially instructed the jury, incorrectly, that the defendant need only "knowingly" aid and abet another in the commission of a breaking and entering. The judge later told the jury "This is a complicity charge. You've been instructed that that means aiding and abetting - that the allegation - another in the commission of breaking and entering. You can read into that instruction that there was present in the mind of the defendant a specific intention to aid and abet another on the commission of a theft."

{¶ 50} The Appellee says this "clarified the definition of purpose as it related to Pollard's complicity charge." (Appellee's brief, pg. 4). First, the indictment was for complicity to commit breaking and entering, not complicity to commit theft.

{¶ 51} Second, the "clarification" did not say that the State must prove that the defendant had a specific intention to aid and abet another in the commission a theft (or breaking and entering), but rather, the jury could have heard, "You, the jury, can find from my previous instruction, where I told you that you must find that the defendant only knowingly aided and abetted another to trespass. . .with the purpose to commit a theft offense, that I meant to tell you that there was a specific intention to aid and abet another in the commission of a theft, trespass, or breaking and entering."

{¶ 52} I find this less than clarified what culpable mental state the jury must find that

the State proved with regard to what offense. Nonetheless, especially since there was no objection and the defense was that the defendant was not at the location (as opposed to he was there but did not knowingly/purposely aid and abet anyone in doing anything), I agree this was not plain error.

. . . . . . . . . .

(Hon. James A. Brogan, retired from the Second District Court of Appeals, sitting by assignment of the Chief Justice of the Supreme Court of Ohio).

Copies mailed to:

Lisa M. Fannin
Lucas W. Wilder
Hon. Richard J. O'Neill